Jane A. GEARHART, Plaintiff,

v.

STATE OF OREGON, Defendant.

Civ. No. 75–146.

United States District Court,
D. Oregon.

March 29, 1976.

William B. Wyllie, Salem, Or., for plaintiff.

William F. Hoelscher, Asst. Atty. Gen., Salem, Or., for defendant.

## OPINION

BURNS, District Judge:

### I. JURISDICTION:

Plaintiff (Gearhart), a former Deputy Legislative Counsel, brought this action against the State of Oregon (State) under the provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She claimed denial of equal pay, advancement and ultimately discharge, all in violation of § 703(a)(1) of the Act because, she says, the denials and discharge were by reason of her sex. 42 U.S.C. § 2000e–2(a)(1). She seeks reinstatement and money damages (lost wages due to denial of her advancement and her termination), as well as attorney's fees. Jurisdiction is based upon 42 U.S.C. § 2000e–5(f)(3).

State moved for summary judgment on the grounds, first, that Gearhart was not an employee as defined by § 701(f) of the Act, 42 U.S.C. § 2000e(f), and, secondly, partial summary judgment that her claim for money damages is barred by the Eleventh Amendment.[1] Pending the outcome of cases currently before the Ninth Circuit and the Supreme Court, the Eleventh Amendment issue has been stayed. While the issue of Plaintiff's status was one which might arguably be one for summary judgment, given the Ninth Circuit strictures on summary judgments, e. g. *Moore v. Matthews,* 473 F.2d 328 (9th Cir. 1972), it was deemed more appropriate simply to try the "employee status" issue on the basis of segregating that issue. Rule 42, Fed.R.Civ.P.

### II. NATURE OF EMPLOYMENT:

This phase of the case turns on the interpretation of § 701(f), which provides as follows:

"The term 'employee' means an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision."

In order to place the matter in proper context and to provide a framework for disposition of the respective contentions, it is necessary to understand the nature of Plaintiff's employment and duties as a Deputy Legislative Counsel between May 1, 1961, and July 9, 1973, the date of termination. Chapter 173 of the Oregon Revised Statutes governs the creation and duties of legislative service agencies. The Legislative Counsel Committee is governed by §§ 173.111 to 173.-350. This committee, established as a joint committee of Legislative Assembly, selects a Legislative Counsel (Counsel) to serve as its executive officer. The committee fixes the salary of Counsel and has general oversight duty with respect to his budget, duties and activities. Generally, Counsel's work is to draft bills and provide research for the Legislature. The other main portion of Counsel's duties includes revision, codification, annotation, etc., of the Oregon Revised Statutes. A more detailed listing of the various duties of Counsel appears in a footnote.[2] Counsel is authorized, subject

---

1. Summary judgment was originally granted to State, but after reconsideration the motion was denied.

2. Some of the pertinent duties are as follows: to be in attendance at sessions of the Legislative Assembly, ORS 173.120; to prepare or assist in the preparation of legislative measures requested by legislators and state agen-

cies, ORS 173.130(1); to give consideration and service to measures before the Legislative Assembly, ORS 173.130(2); to perform or cause to be performed research services requested by the Legislative Assembly, ORS 173.130(3); to participate in legal proceedings when requested, ORS 173.135; to prepare initiative measures when properly requested, ORS 173.140; to plan and supervise the revi-

to the approval of the committee, to hire and fire, and to fix the salaries of professional assistants as well as clerical and other employees deemed necessary for the performance of his duties. Members of the Counsel's staff are exempt from civil service otherwise applicable to state employees. ORS 240.200(4).

The trial showed that Plaintiff's duties included bill drafting, research and other similar assistance provided to members of the Legislature as well as statute and annotation revision of ORS. As is not unexpected, State emphasizes the bill drafting, research and direct assistance activities performed by Plaintiff for members of the Legislature. Plaintiff, on the other hand, emphasizes that the great bulk of her work was in annotation revision of the Oregon Revised Statutes. The evidence showed that at one time or another Plaintiff took part in all or nearly all of the types of work authorized to be done by Counsel. There was some dispute between the parties as to the way in which duties were assigned to Plaintiff as a member of the Counsel's staff. The evidence showed that in some instances a legislator made a request of Counsel, who then assigned the work to Plaintiff; in other instances, legislators would make the request directly to her or to another deputy. In these latter instances, an appropriate record would be made by the deputy of the receipt of the request and retention by her of the request as a project of her own. If Counsel wished to reassign it, he could do so.

Organizationally, Counsel so structured his staff as to have various members specialize in various types of legislative activity. One would be generally responsible for matters relating to highways; another, agriculture, and so on. Obviously, as tenure in office of a deputy lengthens, acquisition of expertise in a particular area is to be expected; so it would be normal for a legislator who was, say, on the highway committee, to come to look increasingly to the "highway" deputy. In addition, during the hustle and bustle of the legislature it would not be surprising to find busy legislators going directly to the deputy with recognized expertise and an assignment to that particular substantive area. Such shortcutting, of course, would be normal. It would probably increase in the latter days of the session, when the Legislature is hurrying and being harried to complete its work and adjourn.

The evidence disclosed that all concerned, legislators, Counsel, and deputies, were keenly aware of the prohibition in ORS 173.240 forbidding Counsel or staff to "oppose, urge or attempt to influence legislation." All concerned also agreed that such did not happen, but there was awareness and concern that this is a difficult line to draw. Straight bill drafting, research on the affected statutes, study of interrelationships between existing statutes and proposed amendments, and the interplay between several proposed new amendments or new legislation may well inevitably have policy or political ramifications or overtones. Even a political ostrich working in Counsel's office could not be blind to the policy or political effects of a given proposal. To deny that some mixture occurs would be to deny the facts of life. As Justice Frankfurter observed, we "should not be ignorant as judges of what we know as men." [3] Hence, while bill drafting might be defined as the embodiment in words by a deputy of the ideas of the Legislature, it is inevitable that the ideas themselves, when crystallized into sentences, paragraphs and sections of a proposed bill, do have policy and political effect and overtones.

Can it be said, therefore, that the statutorily mandated neutrality of the draft-

---

sion, clarification, classification, arrangement, codification, annotation, indexing, printing, binding, publication, copyrighting, sale and distribution of the Oregon Revised Statutes, ORS 173.150(1)(a).

3. My reluctance to quote an appropriate judicial axiom with a sexist reference in a sex discrimination case is overcome by the aptness of the aphorism. *Watts v. Indiana,* 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801, 1805 (1949).

er ceases to exist because of the lack of neutrality of the ideas themselves and of their rippling effect in the Legislature and in the policy and political arena beyond? I think not.

## III. INTERPRETATION OF § 701(f):

In light of the evidence, it must be determined whether or not Plaintiff is an exempt employee within the meaning of § 701(f). The Civil Rights Act of 1964 originally defined an employee simply to mean an individual employed by an employer. When, in 1972, Congress was considering the extension of the Equal Employment provision of the Civil Rights Act to public officials at state or local levels, it became apparent that to leave this broad definition unchanged would sweep into the ambit of the Act every public official in the state from the governor on down. After considerable legislative struggle and debate the section was amended to exempt certain public employees. Those exempted were as follows:

a) An elected public official;

b) A person chosen by such official to be on the personal staff of that official;

c) An official's appointee on a policy making level;

d) An officials' immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

Plaintiff, of course, was neither an elected public official, nor a person chosen by such an official as a personal staff member. State does not seriously argue that she was an appointee on the policy making level. The issue boils down to whether or not she was "an immediate adviser with respect to the exercise of the constitutional or legal powers of the office." "The office" concerned would be that of state legislator.

Some light is shed on this matter by the conference report of the Congress. The exemption granted to public officials and certain of their staff members originated in the Senate as a result of Sena-tor Ervin's efforts. The House acceded to this amendment in conference. The conference committee stated its intention to

" . . . exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisers or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons of comparable responsibilities at the local level. It is the conferees intent that *this exemption shall be construed narrowly.*" (Emphasis supplied.) 2 U.S.Code Cong. & Adm.News p. 2180 (1972).

The congressional purpose is to be divined, if at all, largely from the debate in the Senate conducted mostly by Senators Ervin, Javits (New York) and Williams (New Jersey). The purpose apparently was to provide exemption from the Act for public officials and those staff members or assistants whose selection by the elected official involves subtle considerations of the mixture of legislative or executive duties with the political facts of life. Realistically, some staff persons must be chosen with an eye not only to those functions which are characterized as those of a statesman, but as well those which are characterized as those of a politician. In short, most—but not all—elected officials are aware that they must keep an eye not only on the next generation but on the next election as well. Congress did not want State and local elective officials to be subjected to the strictures of the Equal Employment Opportunity Act in the selection of staff persons in sensitive or intimate positions. Congress, in using the term "immediate adviser," was trying to avoid exempting large groups of faceless technicians and researchers without sweeping into the Act the close personal policy making advisers deemed to be vitally necessary for the conduct of executive and legislative business by officials who are necessarily politicians as well. During the debate, Senator Williams asked Senator Ervin to define the

clear area of exempt employees from the ambiguous area. Senator Ervin responded that the exemption was for " . . the person who would advise him [the elected official] in regard to his legal or constitutional duties. It would not just be a law clerk." 118 Cong.Rec. 4096–4097 (1972). The relatively high status required to exempt an employee was again emphasized the following day when Senator Williams asked for clarification of the amendment in these terms: "That is basically the purpose of the amendment, to exempt from coverage those who are chosen by the Governor, or by the mayor or the county supervisor, whatever the elected official is, and who are in a close personal relationship and an immediate relationship with him. *Those who are his first line advisers,* is that basically the purpose of the Senator's amendment?" (Emphasis added.) 118 Cong.Rec. 4493 (1972). Senator Ervin responded, "That is the purpose of the amendment, yes." Id.

Only one reported decision exists according to the briefs of the parties and my own research.[4] This case involved the position of assistant district attorney in the State of Georgia. *Wall v. Coleman,* 393 F.Supp. 826 (S.D.Ga.1975) held that such persons were personal staff members so as to be exempt from the Act. It is obvious that the relationship between a district attorney and a deputy on his staff is considerably different from that of a legislator and a deputy legislative counsel such as plaintiff.

While plaintiff was perhaps more than "just a law clerk," she was not a "first line adviser." Her responsibilities to legislators who called upon her for bill drafting, research and other allied chores were not of the sort that necessitate sensitive and intimate relationships of the sort that the Congress seems to have had in mind when drafting the exemption. The absence of this close relationship of a first line adviser was further bolstered at trial. The testimony showed some legislators did not feel their work or Counsel's work would be impeded by applying the Civil Rights Act to Counsel's staff. The evidence in favor of the State's contention failed to show the necessary degree of closeness between legislative elective officials and plaintiff as their "adviser" to establish that "immediate" relationship which Congress deemed necessary to provide a very limited exemption from the strong policy shown toward ending impermissible discrimination in public employment.

Judge Learned Hand captured what seems to me to be the appropriate spirit of statutory interpretation when he said, " . . . interpretation is the art of proliferating a purpose which is meant to cover many occasions so that it shall be best realized upon the occasion in question." *Brooklyn Nat. Corp. v. Commissioner of Int. Rev.,* 157 F.2d 450 (2nd Cir. 1946). I conclude, based largely upon my study of the legislative history and upon the facts developed at trial in this case, that plaintiff is not an immediate adviser with respect to the exercise of the constitutional or legal powers of the members of the state legislature within the meaning of the statute; hence, I conclude that she is not an exempt employee and is, therefore, entitled to the benefits of the Act, assuming, of course, she can show forbidden discrimination occurred and the Eleventh Amendment does not bar some or all of the relief she requests.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

4. A second case, *Kyles v. Calcasieu Parish Sheriff's Dept.,* 395 F.Supp. 1307 (W.D.La. 1975), at first glance may seem to deal with the question. However, under the peculiarities of Louisiana law a deputy sheriff stands in the shoes of the sheriff and is not considered an employee at all. The deputy is considered a public official, possessed of all the powers and authorities granted by law to the sheriff. The Court never reached the question of exemption.