537 F.Supp. 206 (1982)
Kathleen MARAFINO, Plaintiff,
v.
ST. LOUIS COUNTY CIRCUIT COURT, and St. Louis County, Missouri, Defendants.
No. 78-1255C(3).
United States District Court, E. D. Missouri, E. D.
March 29, 1982.
*207 Everett, Sedey & Van Amburg, Mary Anne Sedey, Clayton, Mo., for plaintiff.
Thomas W. Wehrle, Daniel Bartlett, Jr., Clayton, Mo., Shulamith Simon, Sally E. Barker, St. Louis, Mo., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits of plaintiff's second amended complaint, following trial to the Court. The complaint alleges that the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., in refusing to hire the plaintiff because of her sex and because she was pregnant. After consideration of the testimony and exhibits adduced at trial, the parties' briefs and detailed stipulations of fact, and the applicable law, the Court hereby makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.
Plaintiff, Kathleen Marafino, is a white female citizen of the United States of America residing in St. Louis County, Missouri. Plaintiff is an attorney duly licensed and qualified to practice law in the State of Missouri, having graduated from the Washington University School of Law in May, 1976 and having been admitted to the Missouri Bar in September, 1976.
Prior to entering law school in the fall of 1973, plaintiff had taught mathematics in junior high schools for six years.
Defendant St. Louis County is a body politic and corporate, organized and existing under the laws of the State of Missouri. St. Louis County is responsible for the payment of the salaries and benefits of the employees serving the Juvenile Division of the Circuit Court of St. Louis County, and all lawful expenditures of such Court.
The Twenty-first Judicial Circuit of the State of Missouri is the defendant Circuit Court of St. Louis County, Missouri (Circuit Court). Each of the Judges of the Circuit Court may retain such office only on approval of a majority of those voting on the proposition at periodic elections. The Juvenile Court of St. Louis County is one of the Divisions of the Circuit Court, and is responsible for the care, protection and discipline of children who come within the jurisdiction of the Court in accordance with Chapter 211, R.S.Mo.1978.
The Judge of the Juvenile Court, subject to the supervisory control of the Circuit Court en banc, has the authority to select and control the employees necessary to carry out the functions of the Juvenile Division, including the employees of the Division's legal department; the Juvenile Court Judge makes hiring and firing recommendations to the Circuit Court en banc. Circuit Court employees are not subject to the civil service laws of St. Louis County or the State of Missouri. At all times relevant to this action, the number of persons under the control of the Court has exceeded fifteen.
The staff attorneys in the legal department represent and advise the chief juvenile officer and all deputy juvenile officers, screen all matters referred to the Juvenile Court for an initial determination as to the sufficiency of the facts, file petitions with the Court, appear before the Court, prepare and try each case before the Court, including felonies, misdemeanors, status offenses, neglect cases, and terminations of parental rights, and handle all appeals to the appellate courts, and other appellate court proceedings. In 1977, there were 18,199 "referrals," or charges against children referred to the Juvenile Court. During the last six months of 1977, there were 2,242 cases of various natures disposed of after hearing in the Juvenile Court.
*208 In addition to the foregoing, staff attorneys occasionally directly counsel the Judge of the Juvenile Court. During the tenure of the Honorable Ninian M. Edwards as Juvenile Court Judge, staff attorneys reviewed with him various court policies, such as the necessity for disclosure of the names of putative fathers, and the development of procedures under the then recent Missouri Supreme Court Rules of Practice and Procedure for the Juvenile Courts.
The legal department was established in June, 1966, when its first attorney, Corinne Richardson, was hired. Richardson has served as the director of the legal department at all times relevant to this action. Since the establishment of the legal department, the following individuals have performed the duties of staff attorney during the designated periods of time:

Staff Attorney Period of Time
Corinne Richardson 6/1/66 to present
Ann Forrey 9/13/71 to 12/31/72
Craig Donis 11/1/73 to 3/18/77
Thomas Zotos 9/10/72 to 5/16/77
Harold Scheppner 3/26/73 to 8/29/73
Peter Lumaghi 8/1/74 to 10/5/78
Roger Keen 7/1/77 to 12/19/80
William Seely 9/18/77 to present
Nancy Dunn 11/13/78 to present
Mary Susan Goodwin 3/15/79 to present

In April, 1976, the month before she graduated from law school, plaintiff applied for the position of Attorney I in the legal department of the Juvenile Court. Plaintiff was not hired by the Juvenile Court at that time, and in September, 1976, she commenced employment as a Staff Attorney for the Ombudsman Foundation, Inc., a legal services organization in St. Charles, Missouri. Plaintiff represented clients in matters such as collection cases, child support, and domestic cases, and appeared regularly in court.
In January or February of 1977, plaintiff learned that she was pregnant.
In the spring of 1977, the Juvenile Court had four dockets. Its legal department was authorized to have three attorneys besides Richardson. It was also authorized to have two part-time interns who were law students, who usually worked full-time during the summer.
In April of 1977, two Attorney I positions became available due to the appointment of Craig Donis as a Hearing Officer and the upcoming resignation of Tom Zotos. Corinne Richardson decided to recommend William Seely, then a third-year law student, to Judge Edwards for recommendation to the Circuit Court for one of these positions. Seely was at the time a legal intern at the Juvenile Court and had been since March, 1975. He had been employed as a group leader in the Detention Center of the Juvenile Court of St. Louis County from August, 1972 to June, 1973. From June 1973 to July, 1974, he was a supervisor at the Detention Center. His work as an intern at the Juvenile Court required almost no supervision.
Plaintiff was advised of the other opening, and during the month of April she was interviewed by Richardson and Richardson's assistant, Peter Lumaghi. After interviewing all applicants, Richardson believed that Marafino was the best qualified.
Richardson called plaintiff to advise her that she was the best qualified applicant and that the job was hers if she wanted it. (Judge Edwards generally followed the recommendations of his department supervisors, including Richardson, in making his recommendations to the Circuit Court en banc.) Plaintiff replied that she would take the job. Plaintiff then informed Richardson that she was pregnant and that her child was expected to be born in September of 1977. Plaintiff told Richardson that if hired she would be absent from work for a period of one to two months after the birth of her child. Richardson told plaintiff that that might create a problem.
Shortly afterwards, plaintiff met briefly with Judge Edwards, and also with Richardson and Robert Branom, the Director of Court Services. Judge Edwards was introduced to plaintiff and was made aware of plaintiff's pregnancy; plaintiff informed him that she expected to take a leave of absence of four to eight weeks after the birth of her child. Judge Edwards asked Richardson if the legal department would *209 be able to handle such a schedule. Although Richardson was concerned about being able to cover for plaintiff in her absence, and about plaintiff's training, she felt that she had already given plaintiff her word that she would recommend plaintiff for the job. Richardson simply told Judge Edwards that she thought the department could handle plaintiff's leave of absence. Judge Edwards said that since that was the case, he would recommend plaintiff's employment to the Circuit Court en banc. A starting date of June 1, 1977, was agreed upon for plaintiff's employment.
Upon Richardson's recommendation, Judge Edwards forwarded plaintiff's name to the Court en banc for consideration for the position of Attorney I. Judge Edwards also wrote a memorandum to The Honorable Herbert Lasky, one of the Circuit Court judges, asking Judge Lasky to present plaintiff to the Court en banc at its May 13, 1977 meeting. Judge Edwards was scheduled to be in Columbia, Missouri, on that date. Judge Edwards' memo to Judge Lasky stated that plaintiff was pregnant and that plaintiff's proposed work schedule was acceptable to the Juvenile Court.
Plaintiff did appear before the Court en banc on May 13, 1977. William Seely was also introduced to the Court at that meeting. Judge Edwards was not present. Plaintiff was wearing maternity clothes, and her pregnancy was apparent. Judge Lasky read to the Court the memo he had received from Judge Edwards. Several judges, including Judge Ferris, then Presiding Judge of the Circuit Court, and Judge Ruddy, asked plaintiff questions about her pregnancy. In response to their questions, plaintiff informed the Court that she expected to take a leave of absence of four to six weeks, and that she would return to the job afterwards. (Plaintiff lowered her outside estimate of the length of her leave of absence due to a conversation with her doctor, who told her she would be physically able to return to work two weeks after childbirth.) As for Seely, one of the judges opposed his employment as an Attorney I as of June 1, when Seely would not yet have passed the Bar. The Court deferred further consideration of plaintiff's and Seely's applications until its June 3, 1977 meeting.
When Judge Edwards returned to St. Louis he talked to Judge Lasky about the May 13, 1977 meeting. Judge Lasky informed him that consideration of the two applicants had been deferred. Judge Edwards then had conversations with Judge Ruddy and Judge Hoester. With regard to plaintiff's application, Judge Ruddy said that a number of the members of the Court believed it was a bad business practice to hire someone when it was clear that the person hired would be taking a leave of absence in a relatively short period of time. Judge Hoester expressed similar concerns.
After these conversations, and after reading the minutes of the May 13 meeting, Judge Edwards reconsidered his original decision to recommend plaintiff for employment. He came to the conclusion that it had been a mistake to recommend plaintiff, and he also came to the conclusion that the Circuit Court would not approve the hiring of anyone who would be taking a leave of absence of four to eight weeks, for any reason, such as a gall bladder operation or a vacation, within approximately three months after commencing employment. Accordingly, on May 19, 1977, Judge Edwards wrote to Judge Ferriss, withdrawing his submission of plaintiff's name. Judge Edwards noted the consensus of the legal department that plaintiff was the best qualified applicant, and indicated that he would like to resubmit plaintiff's name in the future, if circumstances permitted. He noted, however, that if she were hired at the time, there would necessarily be an interruption in her services to the Court, due to the birth of her child in September.
With respect to Seely's application, Judge Edwards indicated in the letter to Judge Ferriss that he was withdrawing Seely's name, also, until after Seely had taken the Bar examination in July. Judge Edwards said that Seely would be a valuable asset to the Court, and that in lieu of immediately filling the Attorney I spot for which Seely had been recommended, the legal department *210 had gotten approval for the temporary employment of two additional law students.
Judge Edwards did not discuss with Corinne Richardson his decision to withdraw plaintiff's name. Richardson did call the plaintiff to inform her that her application had not been approved. Judge Edwards wrote to plaintiff, enclosing a copy of his letter to Judge Ferriss withdrawing her name.
Thereafter, plaintiff called Judge Edwards to request a meeting with him. Their conference took place on June 3, 1977. Plaintiff expressed her disappointment at the turn of events, and Judge Edwards reiterated the reasons, expressed to Judge Ferriss, that he had withdrawn her name. Judge Edwards urged plaintiff to reapply to the Court after the birth of her child.
The Court finds that Judge Edwards withdrew plaintiff's name from consideration solely because he believed, and because he felt the Court believed, that her projected leave of absence of six to eight weeks, starting in September, would not be beneficial for the Court or for plaintiff's training. The Court finds that the fact that plaintiff is female and the fact that plaintiff was pregnant were not in themselves any part of the reason for Judge Edwards' decision. Further, the Court finds that Judge Edwards did not withdraw the plaintiff's name for the reason that he believed the Circuit Court en banc would prefer not to hire a female or a pregnant female staff attorney.
Plaintiff never gave a termination notice to the Ombudsman Foundation, and she continued to work there with pay until October 15, 1977, when she was laid off due to the termination of the State of Missouri's contract with Ombudsman. Plaintiff's child was born September 9, 1977, although the anticipated date of birth was September 26, 1977.
The position for which plaintiff had originally been recommended was filled by Roger Keen. Keen commenced employment at the Court on July 1, 1977.
Seely continued to work at the Court as an intern both before and after the Bar examination. Before the examination he worked six to eight hours per day. He took 30 hours accrued vacation the week prior to the Bar examination, and he took a one-day personal holiday and two days accrued sick leave during the week of the Bar examination. The week after the Bar, he took 40 hours accrued vacation.
As of September 18, 1977, having graduated from law school and having passed the Bar, Seely was hired as an Attorney I. Pending his employment as Attorney I, the Court did not fill the two additional intern positions which had been authorized.
As of the time of trial, two staff attorneys in the Juvenile Court had been granted leaves of absence: Corinne Richardson, when she was pregnant, and Tom Zotos, who took a one-week leave of absence without pay, together with advance vacation time of 46 hours and accrued vacation time, to take a five week trip. Zotos' trip was taken in the summer of 1975, after he had been employed at the Court nearly three years. However, no staff attorney has ever taken a leave of absence as long as one month during the first six months of employment.
Although, as noted above, Circuit Court employees are not subject to the civil service laws of the State of Missouri or of St. Louis County, the Circuit Court has adopted certain of the civil service rules. Among these rules is a provision that vacation leave may not be used until an employee shall have completed six months of continuous service. The rules also provide that sick leave with pay may be used to cover periods of pregnancy, childbirth and recovery. Full-time permanent employees accrue sick leave at the rate of four hours for each bi-weekly pay period. The rules also provide that in case of pregnancy and/or maternity, an employee may apply in writing for a leave of absence without pay, which may be approved "whenever such leave is considered to be in the best interest of the County service."
*211 The training period for new attorneys in the legal department, that is, the period until they could function somewhat independently of Richardson, varied depending on the prior experience and ability of the individual. The longest training period has been three to four months; the shortest has been a few days. Roger Keen's training period was a matter of weeks. However, the Juvenile Code is a highly specialized body of law, and the Juvenile Court has a very diverse set of functions. According to Judge Edwards, the great part of the early service of a Juvenile Court lawyer is in training.
When Richardson interviewed Nancy Dunn, she asked if Dunn was pregnant or intended to become pregnant. Judge Edwards never instructed any of his department heads to ask such questions.
Plaintiff filed a timely charge of employment discrimination against the defendant Circuit Court on August 11, 1977. On February 28, 1978, the E.E.O.C. issued its determination that there was reasonable cause to believe that plaintiff had been discriminated against, and on August 21, 1978, the Department of Justice issued to plaintiff a Notice of Right to Sue. This action was timely instituted on November 17, 1978.

CONCLUSIONS OF LAW
The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f).
The Court concludes that the position of staff attorney in the Juvenile Court was not that of "an immediate adviser with respect to the exercise of the constitutional or legal powers of the office" of a person elected to public office in the State of Missouri or a political subdivision of Missouri, or a member of such an official's personal staff, so as to except the position of staff attorney from Title VII coverage under 42 U.S.C. § 2000e(f). The Court assumes the position of Circuit Court Judge may be viewed as that of an elected official. However, like the situation in Gearhart v. Oregon, 410 F.Supp. 597 (D.Or.1976), in which Gearhart's position of Deputy Legislative Counsel was held to be within the coverage of Title VII, the position of staff attorney in the Juvenile Court's legal department, at least for newer staff attorneys, was not essentially that of a "first line adviser;" a "sensitive and intimate relationship" was not involved. In short, it appears that the position of a staff attorney, especially a newer staff attorney, vis-a-vis the Juvenile Court Judge, was more akin to that of "just ... a law clerk," which the legislative history shows an intention to include within Title VII coverage. See id. at 600-01. The Court concludes, especially in view of the fact that the Circuit Court en banc had the final word on hiring and firing, and in view of the fact that legal department supervision was in the hands of Richardson, that staff attorneys did not have the high level of personal accountability to the Juvenile Court Judge that was found in the positions of deputy and assistant district attorney with respect to the district attorney in Ramirez v. San Mateo County District Attorney's Office, 639 F.2d 509 (9th Cir. 1981), and Wall v. Coleman, 393 F.Supp. 826 (S.D. Ga.1975), cited by defendants.
The Court further concludes that this action is not barred by the doctrine of judicial immunity. None of the individual Circuit Court judges, including Judge Edwards, remain a party to this action. Moreover, the plaintiff did not deal with Judge Edwards in his judicial capacity or with the Circuit Court en banc in its judicial capacity; this is one of the critical factors to be considered in determining whether the doctrine of judicial immunity applies. See Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Thus, this case is distinguishable from Rheuark v. Shaw, 628 F.2d 297 (5th Cir. 1980), cert. denied 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 364 (1981), cited by defendants, in which the plaintiffs' requests for preparation of statements of facts in their criminal trials were directed to the defendant judge as a judge.
Turning to the merits of plaintiff's allegations, the Court observes that the complaint appears to be premised on a disparate treatment theory, and the Court will *212 address the disparate treatment issue first. Plaintiff established a prima facie case of disparate treatment, as acknowledged by defendant. She proved that she was female; that she applied and was qualified for a job which the Circuit Court was seeking to fill; that she was ultimately rejected despite her qualifications; and that after her rejection the Circuit Court continued to search for an employee of plaintiff's qualifications. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
The burden thus shifted to the defendants to "rebut the presumption of discrimination by producing evidence that the plaintiff was rejected ... for a legitimate, nondiscriminatory reason." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The Court concludes that the defendants amply satisfied this burden through the testimony of Judge Edwards, that he withdrew plaintiff's name from consideration because he was concerned about the impact her planned leave of absence would have upon the Court and upon plaintiff's training, and because he believed that the Circuit Court en banc had the same concerns and would not be willing to hire anyone who was to interrupt his or her employment in the manner planned by plaintiff, for any reason.
The disparate treatment issue is thus focused on whether or not the plaintiff demonstrated that the reason proffered by defendants was the true reason for her rejection. Id. at 256, 101 S.Ct. at 1095. The Court finds that plaintiff has not demonstrated that the proffered reason was a pretext. Although plaintiff attempts to rely on the supposedly preferential treatment accorded Seely, the attempted comparison fails. Seely had been working at the Juvenile Court, albeit as a part-time intern, since March of 1975. He was fully familiar with the procedures and the functions of the Juvenile Court. He continued to work 6-8 hours per day up to the time of the Bar exam. When he took time off for the Bar exam, he took only accrued vacation and accrued sick leave, apart from a one-day personal holiday. It is apparent that plaintiff would not have accrued enough vacation and sick leave to cover her planned leave of absence.[1] Moreover, Seely's total absence from the Court around the time of the Bar exam was approximately 12 working days in length, considerably less than the 20 to 40 working days forecast by the plaintiff to Judge Edwards. In view of these facts, the Court cannot say that the Circuit Court's decision to hold open an Attorney I position for Seely while Seely continued to work as an intern, showed that the reasons given for rejecting plaintiff were pretextual.
The Court turns to a consideration of the merits of a disparate impact theory as applied to the instant case. Plaintiff contends, in her post-trial reply brief, that she established a prima facie case of disparate impact under 29 C.F.R. § 1604.10(a) (1976), which provides that "[a] written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy is in prima facie violation of title VII." Plaintiff contends that she has shown that defendants had a policy or practice of refusing to hire pregnant women. The Court concludes that such a policy or practice was not shown. The fact that Richardson took it upon herself to inquire of Nancy Dunn whether she was pregnant or intended to become pregnant does not show that the Circuit Court or Judge Edwards had decided to adopt a policy of refusing to hire pregnant women. Moreover, it was the length and the timing of plaintiff's planned leave that influenced Judge Edwards' decision, not the mere fact of plaintiff's pregnancy. Furthermore, Richardson herself was allowed to take a leave of absence when she was pregnant, which militates against a conclusion that the Circuit Court *213 excluded pregnant women from employment. Judge Edwards testified that he did not have a policy or practice of excluding pregnant women from employment, and he also testified that plaintiff's application presented the first occasion for consideration of the employment of an individual who intended to take an early leave of absence. The Court finds that the policy or practice contended for by plaintiff has not been shown.
Plaintiff relies on Holthaus v. Compton & Sons, Inc., 514 F.2d 651 (8th Cir. 1975) to show that she established a prima facie case. However, the Court in Holthaus found that plaintiff had established that defendant had a policy of firing pregnant women although non-pregnant employees could take leaves of absence without pay during illnesses. Holthaus is distinguishable from the instant case in that there was no policy or practice of refusing to hire pregnant women proven in the instant case.
Although plaintiff did not specifically allege or argue that the Circuit Court's policy of refusing to hire those who planned to take an early leave of absence had a disparate impact on women, the circumstances suggest the issue, and the Court has considered it. The initial issue is whether the plaintiff has shown that the policy in fact operated to exclude women. If plaintiff satisfied that burden, the burden shifted to the Circuit Court to show that its policy has "a manifest relationship to the employment in question," Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) and that the policy is "necessary to safe and efficient job performance," Dothard v. Rawlinson, 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977). "The touchstone is business necessity." Griggs, supra, 401 U.S. at 431, 91 S.Ct. at 853.
Plaintiff did not introduce any evidence that would support a finding of disparate effect. The evidence was that four of the ten individuals who have been employed as staff attorneys at the Juvenile Court, including the first two hired, were women. Although no figures on numbers of men and women applicants were introduced, the fact that 40% of those hired have been women does not appear to lend support to a disparate impact theory.
The Court realizes that women are subject to most of the same types of illness and to the necessity for most of the same types of surgery that men are. Women are subject to the additional occasional physical condition of pregnancy and to the resulting event of childbirth. It might be presumed that those two facts together establish that women, more often than men, are in a position to know that they will require leaves of absence from work, for physical reasons, at a fairly definite future time. However, the Court cannot simply imagine a disparate impact. Harper v. Trans World Airlines, Inc., 525 F.2d 409, 414 (8th Cir. 1975). In the total absence of any evidence that women do in fact request lengthy leaves of absence more frequently than men, the Court cannot conclude that disparate impact has been shown.
Although the case is not strictly apposite, plaintiff relies on Nashville Gas Co. v. Satty, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), for the proposition that although an employer need not extend to pregnant women employees benefits that men cannot and do not receive, Title VII does not permit an employer to impose a burden on female employees in such a way as to deprive them of employment opportunities. In Satty, the Supreme Court held that the employer's policy of denying accumulated seniority to employees returning to work after pregnancy leave, while not depriving employees returning from other disability leaves of such seniority, violated Title VII. The Court also followed General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), in holding that another policy of the employer, that of allowing sick pay to employees disabled by nonoccupational sickness but not to those disabled by pregnancy, was not a per se violation of Title VII. The Court held that although the former policy might appear to be evenhanded, it imposed a burden on women that men did not bear.
*214 However, in Satty, pregnancy had been singled out by the employer as the only nonoccupational physical disability which caused the loss of accrued seniority. No such singling out of pregnancy has occurred in the instant case. The Court believes that proof of a disparate impact on the Circuit Court's hiring policy was essential to plaintiff's case, and that it has not been supplied.
Even assuming that a disparate impact of the Circuit Court's policy has been proven, the Court concludes that the defendant Circuit Court adequately demonstrated that its policy was a business necessity and had a manifest relationship to the job of staff attorney. It is true that Corinne Richardson had told Judge Edwards (although with some misgivings in her own mind) that she thought the legal department could handle plaintiff's planned leave of absence. However, Judge Edwards had the final responsibility for recommending applicants and he was entitled to come to his own conclusions concerning the impact of plaintiff's planned leave of absence. There is no evidence to indicate that Judge Edwards knew that plaintiff had lowered to six weeks her outside estimate of the leave she would take. Thus, Judge Edwards was faced with the prospect of as much as a two-month interruption in plaintiff's service. Considering that 2,242 cases were disposed of in the latter half of 1977 after being heard in the Juvenile Court, the absence of one of four staff attorneys for two months would obviously have had a sizeable impact.
Moreover, the adverse impact would undoubtedly have been intensified by the fact that the plaintiff's service would have been interrupted so early in her Juvenile Court employment. Although according to Richardson, it has never required more than three to four months before a staff attorney has been able to function independently, the mere ability to function independently does not mean that a staff attorney has mastered all of the intricacies of Juvenile Court functions and procedures. According to Judge Edwards, training constitutes the great part of the early service of a staff attorney, and he was entitled to take this into account in assessing the impact that plaintiff's planned leave of absence would have. Even Richardson testified that she was concerned that there might be regression in plaintiff's training due to her planned leave of absence.
The Court concludes that Judge Edwards' decision to withdraw plaintiff's name from consideration was a decision dictated by the exigencies of the Juvenile Court, and was not a violation of Title VII in any respect. Accordingly, judgment will be entered for defendants in this cause.
The defendant Circuit Court has requested an award of attorneys' fees in its answer to the second amended complaint. Because this Court does not find that plaintiff's action was frivolous, unreasonable, or groundless, the request for an award of attorneys' fees will be denied. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).
NOTES
[1] Assuming that plaintiff would have worked 14 weeks before taking the leave of absence, she would have accrued approximately 28 hours of sick leave. Plaintiff would not have worked at the Court long enough to use any accrued vacation time.