CALIFORNIA FEDERAL SAVINGS AND LOAN ASSOCIATION, etc.; Merchants and Manufacturers Association, etc.; California Chamber of Commerce, etc., Plaintiffs/Appellees,

v.

Mark GUERRA, etc.; Department of Fair Employment and Housing; Cruz F. Sandoval, etc.; Fair Employment and Housing Commission of the State of California, Defendants/Appellants.

Lillian Garland, Applicant for Intervention/Appellant.

Nos. 84–5843, 84–5844.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 1985.

Decided April 16, 1985.

As Amended May 7, 1985.

Pamela Hemminger, Los Angeles, Cal., for plaintiff-appellees.

Marian M. Johnston, Deputy Atty. Gen., San Francisco, Cal., for defendants-appellants.

Linda Krieger, San Francisco, Cal., for applicant for intervention, appellant L. Garland.

Before PREGERSON and FERGUSON, Circuit Judges, and GILLIAM,*.

* Hon. Earl B. Gilliam, United States District Judge for the Southern District of California, sitting by designation.

FERGUSON, Circuit Judge:

California law requires employers covered by Title VII to grant pregnancy disability leave of up to four months to their employees. Cal.Gov't Code § 12945(b)(2).[1] Title VII prohibits employers from discriminating on the basis of sex. 42 U.S.C. § 2000e–2(a).[2] This prohibition includes, by virtue of the Pregnancy Discrimination Amendment ("PDA"), discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k).[3] California Federal Savings and Loan Association ("Cal Fed") maintains a disability leave policy that is, on its face, gender-neutral. It fails, however, to afford to female employees California's statutorily required four-month pregnancy disability leave.[4]

Lillian Garland was a receptionist/PBX operator with Cal Fed. From January to April 1982, she took a four-month pregnancy disability leave. In April, Cal Fed denied Garland's request for reinstatement to the same or similar job; Garland did not return to work at Cal Fed until November 1982. California's Department of Fair Employment and Housing therefore served Cal Fed with a complaint in May 1983. The Department alleged, on behalf of Garland, that Cal Fed's disability leave policy violated section 12945(b)(2) because it failed to provide Garland four months of pregnancy disability leave and reinstatement to the same or similar job.

Cal Fed then filed this suit in district court on August 1, 1983, seeking declaratory and injunctive relief against the enforcement of section 12945(b)(2) on the basis of preemption by federal antidiscrimination

---

1. Cal. Gov't Code § 12945(b)(2) provides in relevant part:

   It shall be an unlawful employment practice unless based upon a bona fide occupational qualification:

   . . . .

   (b) For any employer to refuse to allow a female employee affected by pregnancy, childbirth, or related medical conditions ...

   . . . .

   (2) To take a leave on account of pregnancy for a reasonable period of time; provided, such period shall not exceed four months. Such employee shall be entitled to utilize any accrued vacation leave during this period of time. Reasonable period of time means that period during which the female employee is disabled on account of pregnancy, childbirth, or related medical conditions.

   Cal.Gov't Code § 12945(e) makes these provisions applicable to Cal Fed:

   (e) The provisions of this section, except paragraph (2) of subdivision (b), shall be inapplicable to any employer subject to Title VII of the federal Civil Rights Act of 1964.

2. 42 U.S.C. § 2000e–2(a), Title VII of the Civil Rights Act of 1964, provides:

   (a) Employer practices

   It shall be an unlawful employment practice for an employer—

   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

   (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

3. The PDA, 42 U.S.C. § 2000e(k), added to Title VII in 1978, amends the definitions portion of the statute, and provides in relevant part:

   (k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise.

4. The district court's finding of fact No. 7 described Cal Fed's disability leave policy. The court found, among the policy's provisions, the following:

   (a) An employee must have completed the third month of employment in order to be eligible [for disability leave].

   (b) [T]he position the employee is vacating may have to be filled. . . .

   (c) *Cal Fed reserves the right to terminate an employee on leave of absence if a similar and suitable position is not available. . . .*

law—Title VII.[5] Cal Fed prevailed on cross-motions for summary judgment. The district court held that Title VII preempted section 12945(b)(2) · because it "[d]iscriminat[es] against males based on pregnancy." The state defendants appeal this ruling.

Lillian Garland raises several other issues on appeal which do not go to the merits of the case. In this opinion, we address the merits; in a separate, unpublished memorandum disposition, filed concurrently with this opinion, we address the other issues, 760 F.2d 274.

## I.

We hold that the district court's conclusion that section 12945(b)(2) discriminates against men on the basis of pregnancy defies common sense, misinterprets case law, and flouts Title VII and the PDA.[6]

The district court relied only upon *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983), for the proposition that section 12945(b)(2) "[d]iscriminat[es] against males based on pregnancy." *Newport News* stands for no such thing. In deciding whether the protections of the PDA extended to the spouses of employees, the Supreme Court in *Newport News* actually held: "discrimination based on a *woman's* pregnancy is, on its face, discrimination because of *her* sex. And since the sex of the spouse is always the opposite of the sex of the employee, it follows inexorably that

discrimination *against female spouses* in the provision of fringe benefits is also discrimination against male employees." 103 S.Ct. at 2631 (emphasis added). Thus, the employer in that case had to extend pregnancy benefits to make employees' wives' coverage equivalent in comprehensiveness to that of employees' husbands.

Citing *Newport News* for the rule that employers may disregard a state statutory obligation to provide pregnancy disability leave stands that case on its head. *Newport News* extended a pregnancy benefit, while Cal Fed seeks to limit one. *Newport News* measured equivalence of benefits by the comprehensiveness of their coverage of the disabilities to which each sex is subject, while Cal Fed seeks to measure equality of benefits by the sameness of coverage despite differences in need. *Newport News* found that inadequate pregnancy coverage discriminated against females—wives—and against their husbands only because the husbands-employees' total benefit package was thereby diminished, while Cal Fed claims that adequate pregnancy leave discriminates against male employees—who do not get pregnant and whose total disability package suffers no consequent diminution.

*Newport News* not only does not prohibit section 12945(b)(2), it provides a framework for harmonizing the California statute and the PDA. Within this framework, we first analyze the scope of Title VII's preemption; next, we discuss the effect of the PDA on employment discrimination law.

(Emphasis supplied).

**5.** Earlier in the lawsuit, Cal Fed dropped its additional claims for declaratory and injunctive relief against the enforcement of section . 12945(b)(2) on the basis of ERISA preemption.

**6.** The plaintiffs asserted that § 12945(b)(2) "has caused, and unless enjoined by this Court, will continue to cause, plaintiffs undue hardship and irreparable injury for which plaintiffs have no adequate remedy at law." Complaint ¶ 27. These injuries include state civil and criminal penalties and substantial economic harm. *See,*

*e.g.,* Complaint ¶ 27; Brief of Appellees at 48–51; Stipulated Findings of Fact ¶¶ 12, 21; District Court Findings of Fact Nos. 12, 21; District Court Conclusion of Law No. 8. Thus, plaintiffs asserted their own legal and business interests in challenging the statute, despite the fact that the district court, in finding that § 12945(b)(2) discriminates against men, rested its decision at least in large part on the purported interests of third parties: male employees who did not challenge the statute. *See, e.g.,* District Court Conclusions of Law Nos. 3–5.

## II.

The question this case presents is whether Title VII's prohibition of discrimination in employment on the basis of sex, as clarified by the definitional amendments of the PDA, preempts section 12945(b)(2). *See Newport News*, 103 S.Ct. at 2626–27. Our analysis starts with Title VII's preemption provisions, 42 U.S.C. § 2000e–7 and 42 U.S.C. § 2000h–4. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 2899–901, 77 L.Ed.2d 490 (1983) (determining whether ERISA preempted state disability law by first looking to ERISA's plain language and legislative history).

> Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an *unlawful* employment practice under this subchapter.

42 U.S.C. § 2000e–7 (emphasis supplied).

> Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is *inconsistent* with any of the purposes of this Act, or any provision thereof.

42 U.S.C. § 2000h–4 (emphasis supplied).

■ The reach of Title VII's preemption provision is thus narrow. "Title VII does not itself prevent States from extending their nondiscrimination laws to areas not covered by Title VII. . . ." *Shaw*, 103 S.Ct. at 2903. Title VII "preserve[s] the effectiveness of state antidiscrimination laws." *Rosenfeld v. Southern Pacific Co.*, 444 F.2d 1219, 1226 (9th Cir.1971) (citing 110 Cong.Rec. 7243, 12721 (1964) (comments of Senators Case and Humphrey)). *Accord Burns v. Rohr Corp.*, 346 F.Supp. 994, 998 (S.D.Cal.1972) ("the purpose of 42 U.S.C. §§ 2000e–7 and 2000h–4 was essentially to assure preservation of state anti-discrimination laws and not to save inconsistent laws.").

Does section 12945(b)(2) require an employment practice that is "unlawful" under, or "inconsistent" with, Title VII? This is a narrow inquiry. We need not determine, as the litigants would have us do, whether Title VII compels employers to grant reasonable pregnancy disability leave to protect women from the potentially disparate impact of facially neutral, but inadequate, disability leave policies; we need only decide whether section 12945(b)(2) is permissible under Title VII. *Cf. Garcia v. San Antonio Metropolitan Transit Authority*, — U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) ("The essence of our federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal, no matter how unorthodox or unnecessary anyone else—including the judiciary—deems state involvement to be."); *Hawaii Housing Authority v. Midkiff*, — U.S. ——, 104 S.Ct. 2321, 2328–31, 81 L.Ed.2d 186 (1984) (examining the extent of a state's police powers). We need not determine whether some set of facts, which might show that the statute has harmed a woman's quest for employment, might render section 12945(b)(2) discriminatory as applied; we decide only a challenge to the facial validity of section 12945(b)(2) as presented by the district court's legal conclusion on cross-motions for summary judgment. We decline to conjure up a factual record (*compare Abraham v. Graphic Arts International Union*, 660 F.2d 811 (D.C.Cir.1981), *with Marafino v. St. Louis County Circuit Court*, 537 F.Supp. 206, 213 (E.D.Mo.1982), *aff'd*, 707 F.2d 1005, 1006 (8th Cir.1983)), or to rely on possibly stereotypical assumptions. *See Califano v. Goldfarb*, 430 U.S. 199, 206–07, 97 S.Ct.

1021, 1026–27, 51 L.Ed.2d 270 (1977). And, because section 12945(b)(2) deals with a condition that is unique to women—pregnancy disability rather than, say, parenting—our decision has no bearing on the lawfulness of state statutes or employment practices that classify on the basis of purportedly sex-linked factors that are actually less biological than stereotypical. *See,* Note, *Toward a Redefinition of Sexual Equality,* 95 Harv.L.Rev. 487, 508 (1981) (courts should "refus[e] to label [sexual] inequalities as natural, even when they may appear so"); Note, *Pink Collar Blues: Potential Hazards of Video Display Terminal Radiation,* 57 S.Cal.L.Rev. 139, 154–55 (1983) (legislative protections against hazards feared linked to pregnancy but not proven confined to pregnancy should be gender-neutral).

### III.

Prior to the enactment of the PDA, the Supreme Court consistently upheld, against Title VII and equal protection challenges, employer plans that excluded pregnancy from disability coverage. In *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the Court held that California's disability insurance program's exclusion of pregnancy does not violate the equal protection clause. In *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Court held that an employer's otherwise inclusive disability benefit plan that fails to include benefits for pregnancy does not violate Title VII, because discrimination on the basis of pregnancy is not discrimination at all. And in *Nashville Gas Co. v. Satty,* 434 U.S. 136, 143–46, 98 S.Ct. 347, 352–54, 54 L.Ed.2d 356 (1977), the Court held that exclusion of sick leave pay to pregnant employees is not per se violative of Title VII.

Congress enacted the PDA specifically to change both the result of *Gilbert* and its "logic" that purposeful exclusion of pregnancy disability benefits did not amount to sex discrimination. *Newport News,* 103 S.Ct. at 2627. "The [PDA] makes clear that it is discriminatory to treat pregnancy-related conditions *less* favorably than other medical conditions." *Id.* 103 S.Ct. at 2631 (emphasis supplied).

■ In fact, the PDA's enactment showed that Congress sanctioned the expenditure of more dollars on medical coverage for female employees than for male in order to achieve equally complete health benefits for both. When the Supreme Court in *Newport News* extended to the wives of male employees medical coverage for pregnancy, it recognized that "[t]he cost of providing complete health insurance coverage for the dependents of male employees, including pregnant wives, might exceed the cost of providing such coverage for the dependents of female employees." 103 S.Ct. at 2632 n. 26. It extended pregnancy coverage anyway. *See also* 29 C.F.R. § 1604.9(e) ("It shall not be a defense under title VII to a charge of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other."); Note, *Sexual Equality Under the Pregnancy Discrimination Act,* 83 Colum.L.Rev. 690, 711–12 (1983) (legislative history to PDA and EEOC guidelines both endorse the pluralist concept that a cost differential may be necessary to equalize the burdens on reproduction).

Finally, the PDA did not demand that state law be blind to pregnancy's existence. This is the result compelled by the PDA's reversal of *Gilbert,* and its adoption of the *Gilbert* dissent, which concludes, in part, "A realistic understanding of conditions found in today's labor environment warrants taking pregnancy into account in fashioning disability policies." *Gilbert,* 429 U.S. at 159, 97 S.Ct. at 420 (Brennan, J., dissenting). Attributing to Congress an intent that employers or states must ignore pregnancy completely when fashioning their disability policies would be as absurd as discovering a congressional intent that states or employers must completely ignore prostatitis on pain of violating Title VII.

■ Cal Fed claims that the PDA's second clause, "women affected by pregnancy,

childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work," means that states and employers must ignore pregnancy. Because section 12945(b)(2) classifies, on its face, on the basis of pregnancy, Cal Fed concludes that the statute violates this clause of the PDA. Cal Fed, however, ignores the first clause of the PDA: " 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." By making "pregnancy" a substitute for "sex" in Title VII's antidiscrimination mandate, Congress procured for pregnancy that which it had already procured for sex: a guarantee against discrimination of all varieties, including facially neutral policies with a disparate impact. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

■ Cal Fed's argument highlights a tension between the PDA's first clause, which subjects pregnancy to the same types of discrimination analysis to which it subjects sex, and its second clause, which appears to demand pregnancy-neutral policies at all times. Cal Fed would resolve the tension in favor of blindness to pregnancy. We do not. *Newport News'* discussion of the reasons for the PDA's enactment, above, makes clear that Congress intended to reverse *Gilbert*, to require employers to include pregnancy disability leave in their otherwise comprehensive benefit packages, and thus to construct a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise. *Newport News'* discussion of costs imposed by the PDA thus makes clear that Congress saw nothing inconsistent or unlawful about requiring greater dollar expenditures for women

in order to achieve equally complete health care coverage for both sexes. We see no principled reason to distinguish pregnancy disability days, provided by section 12945(b)(2), from the pregnancy disability dollars in *Newport News*. There is no reason to distinguish *minimal* disability coverage provided by section 12945(b)(2) from the *maximal* disability coverage mandated by *Newport News* by stripping away the one substantive benefit that California's statute provides. Thus, we see nothing inconsistent or unlawful about section 12945(b)(2).

### IV.

■ The PDA does not require states to ignore pregnancy. It requires that women be treated equally. As the preceding discussion shows, the PDA also provides a common-sense test of whether a policy—or a statute—affords equal treatment to women who are pregnant. The measure is whether the policy furthers "Title VII's prophylactic purpose of achieving 'equality of employment opportunities.' " *EEOC v. Puget Sound Log Scaling & Grading Bureau*, 752 F.2d 1389, 1392 (9th Cir.1985) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1971)). Thus, equality under the PDA must be measured in employment opportunity, not necessarily in amounts of money expended—or in amounts of days of disability leave expended. Equality in the disability context compares coverage to actual need, not coverage to hypothetical identical needs.

■ It necessarily follows that Title VII does not preempt a state law that guarantees pregnant women a certain number of pregnancy disability leave days, because this is neither inconsistent with, nor unlawful under, Title VII. The number of days guaranteed, like the number of dollars expended, is a means to the goal of employment opportunity.[7]

---

7. We are not the first court to announce that the goal of Title VII is equality of employment opportunity, not necessarily sameness of treatment. *See United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Title VII does not forbid private employers and unions to adopt affirmative action plans); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91

The decision of the district court is RE-VERSED and the case is REMANDED with instructions to grant summary judgment in favor of the state defendants.

S.Ct. 849, 852, 28 L.Ed.2d 158 (1971) (the disparate impact of facially neutral employment policies "cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices"); *La Riviere v. EEOC,* 682 F.2d 1275, 1279–80 (9th Cir.1982) (government may adopt affirmative action plans).