Cynthia A. **FORRESTER,**
**Plaintiff-Appellant,**

v.

Judge Howard Lee **WHITE,**
**Defendant-Appellee.**

**No. 84–1823.**

United States Court of Appeals,
Seventh Circuit.

Argued April 24, 1985.
Decided June 5, 1986.

Mary Anne Sedey, St. Louis, Mo., for plaintiff-appellant.

Imelda Terrazino, Asst. Atty. Gen., Chicago, Ill., for defendant-appellee.

Before ESCHBACH and POSNER, Circuit Judges, and TIMBERS, Senior Circuit Judge.*

* The Honorable William H. Timbers, Senior Circuit Judge for the Second Circuit, sitting by designation.

1. The statutory duties of an adult-probation officer are set forth in Ill.Rev.Stat., ch. 38, ¶ 204–4 (1983), as follows:

   (1) To investigate as required by section 5–3–1 of the "Unified Code of Corrections", approved July 26, 1972, as amended, the case of any person to be placed on probation. Full opportunity shall be afforded a probation officer to confer with the person under investigation when such person is in custody.

ESCHBACH, Circuit Judge.

The primary question presented in this appeal is whether the doctrine of judicial immunity shields a state-court judge from liability for damages in a § 1983 action for alleged sex-based discrimination arising from the dismissal of a probation officer. The district court found that the defendant judge was immune. For the reasons stated below, we will affirm.

I

For the purposes of deciding this appeal, the facts may be summarized as follows:

Defendant Howard Lee White was at all times material to this dispute a Circuit Judge of the Seventh Judicial Circuit of the State of Illinois and served as Presiding Judge of the Circuit Court in Jersey County, Illinois, which is the state trial court of general jurisdiction for that county. The Chief Judge of the Seventh Judicial Circuit, or his designee, has the authority under Illinois law to hire and dismiss, at his, or his designee's, pleasure, juvenile-court probation officers. Ill.Rev.Stat, ch. 37, ¶¶ 706–1, 706–5(1) (1983). Judge White was acting as the designee of the Chief Judge for the purposes of hiring and firing juvenile-court probation officers.

In April of 1977, Judge White hired plaintiff Cynthia Forrester to serve as a juvenile and adult probation officer and a director of court services for the Circuit Court. She worked under Judge White's direct supervision until her termination. As an adult-probation officer,[1] she prepared pre-

(2) To notify the court of any previous conviction for crime or previous probation of any defendant invoking the provisions of this act.

(3) All reports and notifications required in this Act to be made by probation officer shall be in writing and shall be filed by the clerk in the respective cases.

(4) To preserve complete and accurate records of cases investigated, including a description of the person investigated, the action of the court with respect to his case and his probation, the subsequent history of such person, if he becomes a probationer, during the continuance of his probation, which records shall be open to inspection by any judge or by any probation officer pursuant to order of

sentencing reports in all felony cases for the judge to consider, monitored the actions of adults placed on probation, and filed recommendations for revocations as necessary. As a juvenile-probation officer,[2] Forrester received and investigated complaints regarding status offenders, possible abuse and neglect cases, and juveniles charged with criminal conduct. After an investigation, she referred such cases to social agencies for treatment, provided counseling herself, or worked with the State's Attorney in filing cases in juvenile court. When juvenile-court cases were filed, she assisted in preparing them for hearings; in addition, she made recommendations for disposition and prepared pre-sentencing reports for the judge to consider in deciding what should be done with the juvenile. When a juvenile was placed under court supervision or on probation, she monitored the juvenile to assure that he was complying with the

court, but shall not be a public record, and its contents shall not be divulged otherwise than as above provided, except upon order of court.

(5) To take charge of and watch over all persons placed on probation under such regulations and for such terms as may be prescribed by the court, and giving to each probationer full instructions as to the terms of his release upon probation and requiring from him such periodical reports as shall keep the officer informed as to his conduct.

(6) To develop and operate programs of reasonable public service work for any persons placed on probation or supervision, providing, however, that no probation officer or any employee of a probation office acting in the course of his official duties shall be liable for any tortious acts of any person placed on probation or supervision as a condition of probation or supervision, except for wilful misconduct or gross negligence on the part of the probation officers or employee.

No person assigned to a public service employment program shall be considered an employee for any purpose, nor shall the county board be obligated to provide any compensation to such person.

(7) When any person on probation removes from the county where his offense was committed, it shall be the duty of the officer under whose care he was placed to report the facts to the probation officer in the county to which the probationer has removed; and it shall thereupon become the duty of such probation officer to take charge of and watch over said probationer the same as if the case originated in that county; and for that purpose he shall have the same power and authority over said probationer as if he had been originally placed in said officer's charge; and such officer shall be required to report in writing once a month the results of his supervision to the probation officer in whose charge the said probationer was originally placed by the court.

(8) To perform such other duties as are provided for in this act or by rules of court and such incidental duties as may be implied from those expressly required.

2. The statutory duties of a juvenile-probation officer are set forth in Ill.Rev.Stat., ch. 37, ¶ 706-1 (1983), as follows:

(a) To receive, investigate and evaluate complaints indicating delinquency, behavior otherwise requiring supervision, neglect or dependency, within the meaning of Sections 2-2 through 2-5; to determine or assist the complainant in determining whether a petition should be filed under Section 4-1 or whether referral to an agency, association or other person or whether some other action is advisable; and to see that the indicating filing, referral or other action is accomplished.

(b) When a petition is filed under Section 4-1, to make prehearing investigations and formulate recommendations to the court.

(c) To counsel and, by order of court, to supervise minors referred to the court; to conduct indicated programs of casework, including referrals for medical and mental health service, organized recreation and job placement for wards of the court and, when appropriate, for members of the family of a ward; to act as liaison officer between the court and agencies or associations to which minors are referred or through which they are placed; when so appointed, to serve as guardian of the person of a ward of the court; to provide probation supervision and protective supervision ordered by the court; and to provide like services to wards and probationers of courts in other counties or jurisdictions who have lawfully become local residents.

(d) To arrange for placements pursuant to court order.

(e) To assume administrative responsibility for such detention, shelter care and other institutions for minors as the court may operate.

(f) To maintain an adequate system of case records, statistical records, and financial records related to juvenile detention and shelter care and to make reports to the court and other authorized persons, and to other governmental bodies lawfully requiring them.

(g) To perform such other services as may be appropriate to effectuate the purposes of this Act or as may be directed by any order of court made under this Act.

terms of court orders. When necessary, she recommended revocations.

Forrester performed these duties until July 1979. At that time, Jersey County received a grant from the State of Illinois to operate the Jersey County Juvenile Court Intake and Referral Services Project. The project was designed to divert juveniles from the court system by providing alternative methods of remedying their problems. When the project started, Judge White appointed Forrester the Project Supervisor and her duties increased commensurably. In this capacity, she was responsible for directing and supervising project staff members, establishing an office and new procedures, maintaining records, making reports, and ensuring that the program met federal and state requirements. She was also required to recruit advocate volunteer counselors to work with juveniles, contract with other social-services agencies, develop a community organization that would provide foster homes, and manage public relations. In addition, Forrester did a large portion of the work with juveniles under the grant project and continued to do juvenile probation work.

White discharged Forrester on October 1, 1980. Forrester also claims that she was improperly demoted prior to her dismissal. We note that the parties presented evidence at trial relating to conflicts between Forrester and a male co-worker and to disputes between Forrester and Judge White regarding Forrester's schedule. These facts, however, are not pertinent to the disposition of this appeal, because Forrester has alleged that she was discriminated against on the basis of her sex. Thus, in considering the propriety of the district court's decision on judicial immunity, we must assume that Judge White demoted and dismissed Forrester on the basis of her sex. The disputes Forrester may have had with co-workers and Judge White are reasons for her demotion and termination that are not related to her sex, and will not be considered.

In July 1982, Forrester filed an action in federal district court and sought recovery under Title VII of the Civil Rights Act of 1964, as well as 42 U.S.C. § 1983 and the Fourteenth Amendment. The procedural history of this litigation is rather involved; much of what transpired below is not relevant to the judicial-immunity question and will not be discussed. Suffice it to say that Forrester pursues on appeal only her § 1983 claim, in which she alleged that she was demoted and terminated by Judge White on the basis of her sex in violation of the equal-protection clause of the Fourteenth Amendment. Although she initially sought both equitable and monetary relief, only her claim for damages remains on appeal.

The § 1983 claim was tried to a jury, which returned a verdict for Forrester and awarded approximately $82,000 in compensatory damages. The district court denied Judge White's motion for judgment notwithstanding the verdict, but granted his motion for a new trial. Judge White then filed a motion for summary judgment in which he argued that he was entitled to absolute immunity from a civil-damage award. The district court agreed and entered judgment in favor of the defendant. Forrester now appeals.[3]

## II

In deciding whether the district court correctly ruled in Judge White's favor, we must first consider the general principles behind the immunity defense. Courts in this country and in England have embraced the doctrine of judicial immunity for centuries.[4] The Supreme Court first articulated the current doctrine in *Bradley*

---

3. Forrester challenges both the grant of summary judgment and the grant of a new trial. In view of our decision that the defendant is absolutely immune from civil-damage liability, we express no opinion as to the propriety of the district court's ruling on the defendant's motion for a new trial.

4. For a discussion of the development of the doctrine in England, see *Pulliam v. Allen*, 466 U.S. 522, 528–36, 104 S.Ct. 1970, 1974–78, 80 L.Ed.2d 565 (1984).

*v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872), in which it ruled that, in order to safeguard principled and independent decision-making, a judge may not be held to answer in civil damages for those "judicial acts" committed in the exercise of his "jurisdiction." [5]  *See also Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The defense does not simply shield judges from civil liability, but also from the related trial proceedings. *Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).[6] It will not, however, protect a judge from injunctive relief, *see Pulliam v. Allen,* 466 U.S. 522, 541–42, 104 S.Ct. 1970, 1981, 80 L.Ed.2d 565 (1984), or from criminal prosecution, *see O'Shea v. Littleton,* 414 U.S. 488, 503, 94 S.Ct. 669, 680, 38 L.Ed.2d 674 (1974); *Ex parte Virginia,* 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1879). In addition, judicial immunity is a creature solely of the common law.[7] However, although it had the constitutional authority to do so, Congress did not abrogate the defense in enacting § 1 of the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1983. *See Pierson,* 386 U.S. at 554–55, 87 S.Ct. at 1217–18.[8]

■ The scope of the defense will be construed broadly to effectuate its purposes, *Dykes v. Hosemann,* 776 F.2d 942, 947 (11th Cir.1985) (en banc) (per curiam), and when it applies, it is absolute and does not depend on the motives of the judge; thus, it is available even if the judge is accused of acting maliciously or corruptly. *Bradley,* 80 U.S. (13 Wall.) at 351; *see also Pierson,* 386 U.S. at 554, 87 S.Ct. at 1218. It must be remembered, however, that it is for the benefit of the public, not corrupt judges. *Pulliam,* 466 U.S. at 532, 104 S.Ct. at 1976; *Bradley,* 80 U.S. (13 Wall.) at 350. As Judge Learned Hand explained in *Gregoire v. Biddle,* 177 F.2d 579 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):

It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible *in practice* to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of

5. Prior to *Bradley,* the Court had stated in *Randall v. Brigham,* 74 U.S. (7 Wall.) 523, 19 L.Ed.2d 285 (1868), that judges were not responsible "to private parties in civil actions for their judicial acts, however injurious may be those acts, and however much they may deserve condemnation, *unless perhaps where the acts are palpably in excess of the jurisdiction of the judges, and are done maliciously or corruptly.*" *Id.* at 537 (emphasis added). In *Bradley,* the Court reconsidered that statement and concluded that "the qualifying words used were not necessary to a correct statement of the law." 80 U.S. (13 Wall.) at 351.

6. It is primarily for this reason that district-court decisions concerning absolute immunity are immediately appealable. *Mitchell v. Forsyth,* —— U.S. ——, ——, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

7. Thus, judicial immunity differs from the immunity afforded members of Congress, as the latter is guaranteed by the Speech or Debate Clause of Art. I, § 6 of the Constitution. *See generally Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). In addition, judicial immunity affords less protection than legislative immunity under the Speech or Debate Clause. *See, e.g., Dennis v. Sparks,* 449 U.S. 24, 30, 101 S.Ct. 183, 187, 66 L.Ed.2d 185 (1980).

8. Congress did, however, abrogate the defense for purpose of awarding attorney's fees under 42 U.S.C. § 1988 in cases where prospective injunctive relief against a judge is granted. *See Pulliam v. Allen,* 466 U.S. 522, 543–44, 104 S.Ct. 1970, 1981–82, 80 L.Ed.2d 565 (1984).

which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

177 F.2d at 581 (emphasis added). *See also McCray v. Maryland,* 456 F.2d 1, 3 (4th Cir.1972). Thus, the effect of the doctrine may be at times harsh in the individual case, *Stump,* 435 U.S. at 363, 98 S.Ct. at 1108, because conflicting interests define the scope of the immunity. The defense presents a tension between the general and the particular, and demonstrates that, in order to safeguard the judicial system generally, some instances of injustice are, unfortunately, inevitable. *See id.; cf. Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Stephens v. Heckler,* 766 F.2d 284, 287–88 (7th Cir.1985).

The Supreme Court in *Bradley* identified five considerations in support of judicial immunity. First, a judge must be able to act on his own convictions without apprehension of personal consequences. Second, because litigation necessarily involves controversy and competing interests, losing parties are quick to ascribe malevolent motives to a judge. Third, because of the ease of alleging bad faith, a qualified "good faith" immunity would be virtually worthless to secure the desideratum of an independent judiciary. Fourth, the prospect of defending civil-damage actions and satisfying judgments would force judges to employ wasteful and distracting devices, such as unnecessarily meticulous record-keeping, to guard against liability and would render judges less inclined to rule forthrightly. Finally, other safeguards, such as appeal and impeachment, reduce the need for private rights of action for damages against judges. *See Bradley,* 80 U.S. (13 Wall.) at 347–54. To these considerations, one should add a sixth: the need to assure quiescence and finality of judgment by reducing the number of possible collateral challenges to judicial decisions. *See Holloway v. Walker,* 765 F.2d 517, 522 (5th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 605, 88 L.Ed.2d 583 (1985).

Of course, if the concerns articulated in *Bradley* in favor of immunity were the only ones we should consider, then there would be no countervailing force and immunity should expand to cover all aspects of a judge's life, professional and private. It is undoubtedly vexing for a judge to be named as a defendant in litigation arising out of, for example, an automobile accident or a domestic dispute; thus, immunity would reach these aggravations so that a judge might rule without distraction on the cases before him. However, we must take into account the cost of dismissing meritorious complaints against judicial officers. The case law has drawn a line between those activities implicating the substance of the judge's decision in the cases before him and those that may consume the judge's time, energy, and money, but should not influence the substance of those decisions. *See, e.g., Harris v. Harvey,* 605 F.2d 330, 336 (7th Cir.1979), *cert. denied,* 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980); *Gregory v. Thompson,* 500 F.2d 59 (9th Cir.1974). In sum, immunity does not shield judges from the trials of life generally.

As the discussion above suggests, it is the nature of the act committed (that is, the relation it has to the process of adjudication), not the identity of the actor who commits it, that determines whether immunity applies. *See Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Stump,* 435 U.S. at 362, 98 S.Ct. at 1107. Using this functional test, the courts have extended absolute immunity to participants (other than judges)

in the judicial process and to officials (other than judges) who carry out "quasi-judicial" functions. The Supreme Court has, for example, granted absolute immunity to federal hearing examiners, administrative law judges, grand jurors, witnesses, and federal and state prosecutors. *See Cleavinger v. Saxner,* — U.S. —, —, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). This court has provided immunity to similarly situated defendants. *See, e.g., Scott v. Schmidt,* 773 F.2d 160 (7th Cir.1985) (harness racing counsel); *Mother Goose Nursery Schools, Inc. v. Sendak,* 770 F.2d 668 (7th Cir.1985) (state attorney general when reviewing contracts on behalf of state), *cert. denied,* — U.S. —, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986); *Trotter v. Klincar,* 748 F.2d 1177 (7th Cir.1984) (parole board); *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir. 1983) (liquor commission); *Ashbrook v. Hoffman,* 617 F.2d 474 (7th Cir.1980) (state partition commission).

At times the courts have relied on the presence of other controls on judicial action, such as the availability and scope of appellate review, in determining whether to allow the defense. *See, e.g., Cleavinger,* — U.S. at —, 106 S.Ct. at 503–04 (1985); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). However, the full array of alternative procedural safeguards is not a prerequisite to the grant of immunity. *See Stump,* 435 U.S. at 368–69, 98 S.Ct. at 1111 (Stewart, J., dissenting); *Mother Goose,* 770 F.2d at 675 n. 6; *Reed,* 704 F.2d at 952. In addition, it has been clear since *Bradley* that an official does not have to serve under terms similar to those of Article III (that is, by appointment with life tenure and no reduction in compensation) in order to invoke the defense. Indeed, as noted above, absolute immunity has been extended to prosecutors and to grand-jury members, even though both exercise their authority subject to little review and do not enjoy the independence of federal judges. By the same token, no one could reasonably argue that the Justices of the United States Supreme Court are not entitled to absolute judicial immunity, *see Moore v. Burger,* 655 F.2d 1265 (D.C.Cir.

1981), even though their decisions are not subject to review by a superior tribunal. One must at times rely on devices other than Article III and direct appellate review to control judicial action. *Cf. Nixon v. Fitzgerald,* 457 U.S. 731, 757–58 & n. 39, 102 S.Ct. 2690, 2705 & n. 39, 73 L.Ed.2d 349 (1982).

Thus, the decision to allow the defense of judicial immunity in a particular case calls for a balancing of these competing concerns. *Dennis v. Sparks,* 449 U.S. 24, 31–32, 101 S.Ct. 183, 188, 66 L.Ed.2d 185 (1980); *Dykes,* 776 F.2d at 942; *Gregory,* 500 F.2d at 63 n. 4. The terms "judicial act" and "jurisdiction" are not self-evident, and only signal the conclusion, rather than the beginning, of a chain of inferences. The characterization given an act depends on the weight of the interests at stake. For certain acts, however, such as the rendering of a judgment, the balance is straight-forward and the law, therefore, settled. *See, e.g., Lowe v. Letsinger,* 772 F.2d 308, 312 (7th Cir.1985). For other acts, a critical evaluation of the concerns underlying the defense is required.

It is not surprising that the plaintiffs in the majority of suits against judicial officers in which the immunity doctrine is successfully invoked are either actual litigants or (as in *Stump* ) individuals with an interest in the litigation. In these cases, the concerns of *Bradley* and its progeny are implicated without question. There is another line of cases, however, in which a former employee of a judge brings suit challenging his dismissal. As we will explain below, the rationale of decisions involving disgruntled litigants is not necessarily applicable to those involving former judicial employees.

The federal courts disagree on the scope of the immunity defense for decisions regarding judicial personnel. *See Goodwin v. Circuit Court,* 729 F.2d 541, 548–49 (8th Cir.) (judge's transfer of hearing officer was administrative, not judicial, decision; thus judge not absolutely immune), *cert. denied,* — U.S. —, 105 S.Ct. 112, 83 L.Ed.2d 55 (1984) and — U.S. —, 105

S.Ct. 1194, 84 L.Ed.2d 339 (1985); *Laskowski v. Mears*, 600 F.Supp. 1568 (N.D.Ind. 1985) (if relationship with probation officer implicates judge's independence, then dismissal is judicial act); *Cronovich v. Dunn*, 573 F.Supp. 1340, 1342 (E.D.Mich.1983) (scope of immunity for judges' personnel decision unclear), *Id.*, 573 F.Supp. 1330, 1335 (E.D.Mich.1983) (failure to appoint plaintiff as Friend of Court not judicial act); *Blackwell v. Cook*, 570 F.Supp. 474 (N.D.Ind.1983) (judge absolutely immune in § 1983 suit challenging dismissal of family counselor for county probation office); *Lewis v. Blackburn*, 555 F.Supp. 713 (W.D. N.C.1983) (decision by state judge not to reappoint magistrate not judicial act), *rev'd on other grounds*, 759 F.2d 1171 (4th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 228, 88 L.Ed.2d 288 (1985); *Marafino v. St. Louis County Circuit Court*, 537 F.Supp. 206 (E.D.Mo.1982) (plaintiff who sought position as juvenile-court staff attorney could invoke Title VII in action for discriminatory refusal to hire because staff attorney does not deal with judge in latter's judicial capacity), *aff'd on other grounds*, 707 F.2d 1005 (8th Cir.1983); *Pruitt v. Kimbrough*, 536 F.Supp. 764 (N.D.Ind.1982) (state judge immune from damages for dismissal of probation officer), *aff'd mem.*, 705 F.2d 462 (7th Cir.1983); *Clark v. Campbell*, 514 F.Supp. 1300 (W.D.Ark.1981) (county judge, in hiring and firing county employees, not performing judicial function); *Shore v. Howard*, 414 F.Supp. 379 (N.D. Tex.1976) (state judge's dismissal of probation officer not judicial act); *cf. Abbott v. Thetford*, 534 F.2d 1101 (5th Cir.1976) (en banc) (under balancing test of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), judicial officer not liable in civil-rights action challenging discharge of chief probation officer), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977). This uncertainty in the case law is understandable, because decisions regarding court personnel depart from the paradigm of *Bradley* and its progeny. However, that does not mean that immunity is not available. It is, for example, of fundamental importance that the modern judge differs from his predecessor in that he must rely more on his staff for advice on substantive decisions, and that certain research functions formerly performed by the judge are now accomplished in part by his staff. A judge's institutional personality, therefore, extends beyond his person. Thus, suits brought by former court personnel may have a powerful, albeit indirect, effect on the rights of litigants. The dispositive question in a particular case is whether that effect bears an appropriate relationship to the judicial process, and hence warrants a grant of immunity.

We pause for a moment to consider the scope of immunity applicable to the personnel decisions of nonjudicial officials. Although the immunity accorded these individuals is not necessarily controlling in the case before us, it may provide strong support for our ruling, if that immunity is shaped and informed by a similar rationale. In *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), for example, the Supreme Court held that the President was absolutely immune from suits based on his personnel decisions. The Court also noted in a related action, *Harlow v. Fitzgerald*, 457 U.S. 800, 811–13, 102 S.Ct. 2727, 2735–36, 73 L.Ed.2d 396 (1982), that presidential aides might, under certain circumstances, enjoy the same immunity for these decisions.

With reference to legislators, the Court has not provided a definitive ruling. In *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), a former congressional staff member alleged that a United States Congressman had, in violation of the Fifth Amendment, discriminated on the basis of sex in terminating her. The Court concluded that the plaintiff was asserting a constitutionally protected right, that her complaint stated a case of action, and that damages were the appropriate remedy. Nonetheless, it was at pains to point out that, while upholding the complaint, it expressed no opinion on the possible immunity defenses of the defendant Congressman. *See* 442 U.S. at 236 n. 11,

246 n. 25, 249, 99 S.Ct. at 2272 n. 11, 2278 n. 25, 2279. *Cf. Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 397–98, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971) (ruling on immunity reserved).

In *Browning v. Clerk,* 789 F.2d 923 (D.C. Cir.1986), the District of Columbia Circuit addressed the question left unanswered in *Davis.* In *Browning,* the former Official Reporter of the United States House of Representatives brought a civil-rights action in which she alleged that her termination was motivated by a racial animus. The court, in holding that the Speech or Debate Clause provided the defendants, members of the United States House of Representatives, with absolute immunity for this personnel decision, stated:

> The touchstone in determining whether the Speech or Debate Clause immunity attaches is whether the activities at issue were "an integral part of the deliberative and communicative processes [of Congress]," ... such that the activity is legislative in character. Personnel decisions are an integral part of the legislative process.... Thus, if the employee's duties are an integral part of the legislative process, such that they are directly assisting members of Congress in the "discharge of their functions," personnel decisions affecting them are correspondingly legislative and shielded from judicial scrutiny.

789 F.2d at 928–29 (citations omitted). The court found that the plaintiff's duties were directly related to the "due functioning of the legislative process," so that the decision to discharge her was legislative in nature and, thus, immunized by the Clause. Similarly, the First Circuit held in *Agromayer v. Colberg,* 738 F.2d 55 (1st Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984), that the defendant, the President of the Puerto Rico House of Representatives, had absolute legislative immunity under the common law in an action challenging his refusal to hire the plaintiff to serve as a press officer. *See also Hudson v. Burke,* 617 F.Supp. 1501 (N.D.Ill.1985); *cf.* 42 U.S.C. § 2000e(f); *Clark v. Tarrant County,* 608 F.Supp. 209, 212–14 (N.D.Tex.1985).

Thus, far from placing the judicial branch above the executive and legislative branches, a decision today in favor of the defendant would do no more than extend to the judiciary the immunity from civil damages arising out of certain personnel decisions that is already enjoyed by the coordinate branches. Separation-of-powers concerns are, of course, a component of the judicial decisions relating to the personnel actions of the federal executive and legislative branches (and might result in a more comprehensive immunity for those branches than that accorded the judiciary). By the same token, questions of comity and federalism are raised in federal suits against state officials. In any event, the unifying rationale is that, if an employee's duties are intimately related to the functioning of the particular process (whether executive, legislative, or judicial on either the federal or state level), then personnel decisions regarding that employee are also part of the process.

■ We turn now to the facts of this case. The plaintiff alleges that she was discharged on the basis of her sex. The first question usually addressed in deciding whether a judge may invoke the defense of judicial immunity is whether he was acting within his "jurisdiction." *See Stump,* 435 U.S. at 356, 98 S.Ct. at 1104–05. As noted earlier, this is not a self-defining term. In the case of a disgruntled litigant, the question is whether the judge had jurisdiction over the subject matter of the dispute. *Id.; Dykes,* 776 F.2d at 945–50. It is clear, nonetheless, that a judge may be acting within his jurisdiction outside, as well as inside, the courtroom. *See, e.g., Lopez v. Vanderwater,* 620 F.2d 1229, 1234 (7th Cir.), *cert. dismissed,* 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980).

The plaintiff's claim in the instant case, however, did not arise directly out of litigation before the court, so the question of subject-matter jurisdiction makes little sense. Still, that does not foreclose the defense in this case, because we believe that the more general concern articulated

in *Bradley* and its progeny is whether the judge was acting within the scope of his "authority." It has been clear since the doctrine's inception that, if a judicial officer is acting in a clear absence of power, immunity will not spare him from the consequences of his acts. *See Bradley*, 80 U.S. (13 Wall.) at 352; *see also Gregory*, 500 F.2d 59. This is the only aspect of the doctrine that has anything resembling a "good faith" component. In the case of litigants, subject-matter jurisdiction defines the specific scope of that general authority. In the context of the dismissal of a staff member, it is our opinion that the threshold question is this: was the judge *authorized* to discharge the plaintiff? The answer in this case is an unqualified yes. In fact, under Illinois law, judges alone are authorized to dismiss juvenile-probation officers.

The more difficult question, of course, is whether the dismissal of the plaintiff was a "judicial act." Again, this is not a self-defining term. It is too much to say that judicial acts are those things that judges do. Such a definition is not only circular, but also results in an unnecessary extension of the immunity doctrine, because it would shield a judge from personnel actions unrelated to the decisional process. An example would be the refusal to hire an individual to serve as a janitor. The reasons supporting judicial immunity are not properly implicated in such a case, even though a judge's apprehension of the possibility of a civil-damage action arising out of the refusal to hire a janitor may affect his mood and distract him from the tasks at hand (and, therefore, affect the rights of the litigants before him). As noted above,

it cannot be the idiosyncracies of a particular judge, or even those of human nature generally, that warrant the application of judicial immunity. Rather, the critical inquiry is whether the person affected by the judge's acts stands in such a relationship to the judicial system as would make immunity appropriate in light of the concerns expressed above. A janitor is not required to provide a judge with advice and information concerning pending cases. Thus, judicial immunity would not protect the judge who refuses to hire an individual to be a janitor.[9]

The Supreme Court in *Stump* developed a two-part test to determine whether a judicial act was at issue. Although articulated in an action brought by a party involved in litigation before the defendant judge, this test addresses the general concerns behind the defense, and there is no reason why it should not apply in the instant case. First, was the function one normally performed by a judge? Second, was the plaintiff dealing with the judge in his judicial capacity? 435 U.S. at 362, 98 S.Ct. at 1107. The answer to the first prong of the inquiry was adumbrated above: under Illinois law, only a judge may order the dismissal of the plaintiff; thus, this function is "normally performed by a judge."

The second prong is troublesome. It is true that judges are protected only when they are acting as "judges," not as administrators.[10] However, saying that something is an administrative act, as opposed to a judicial one, simply states the conclusion. Certain decisions made by judges

---

**9.** By the same token, absolute immunity should not bar a damage action challenging a judge's dismissal of, for example, a court reporter or bailiff. The relationship between a judge and such an employee is perhaps most accurately characterized as "administrative," *i.e.,* one unrelated to the exercise of the judge's discretion. Because a court reporter or bailiff is not as a general matter required to provide a judge with information and advice regarding the substance of the litigation before the court, so that discord between the employer and employee would not implicate the judge's institutional role within the court system, the defense of absolute immu-

nity would be inappropriate. *Cf. Walker v. Jones,* 733 F.2d 923 (D.C.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984).

**10.** *See Stump v. Sparkman,* 435 U.S. 349, 361 n. 10, 98 S.Ct. 1099, 1107 n. 10, 55 L.Ed.2d 331 (1978) (discussing *Gregory v. Thompson,* 500 F.2d 59 (9th Cir.1974), and *Lynch v. Johnson,* 420 F.2d 818 (6th Cir.1970)); *see also Lowe v. Letsinger,* 772 F.2d 308, 312 (7th Cir.1985) (judicial immunity does not apply to ministerial acts) (citing *Ex parte Virginia,* 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1879)).

outside the courtroom may be administrative in one setting and judicial in another. There is a substantial overlap between the two, and the characterization cannot be made without reference to the purposes for immunity.

State law often provides an answer. As suggested above, it may determine, for example, who is in fact a "judge." However, while state law may conclusively determine when a judge is *not* entitled to immunity, *see, e.g., Clark v. Campbell*, 514 F.Supp. 1300 (W.D.Ark.1981), it does not always determine when a judge *is* entitled to immunity, because a state may assign a task to a judge for reasons unrelated to safeguarding principled and independent decision-making.

The assignment under Illinois law to judges of supervision over probation officers is, we believe, directly related to the principles underlying the defense of immunity. There is no question that, in her capacity as a probation officer, the plaintiff was dealing with the defendant in the latter's capacity as a judge. She was rendering advice and recommendations for dispositions to be made by the judge, and the information she provided directly implicated the exercise of the judge's discretionary judgment. *See Abbott*, 534 F.2d 1101; *Pruitt*, 536 F.Supp. 764. Decisions regarding, for example, sentencing, probation, and the revocation of parole and probation are unquestionably judicial acts, and the plaintiff provided crucial advice and information necessary to making those decisions. Her relationship was by necessity founded on confidence and confidentiality. These attributes of the position are the primary reasons that probation officers themselves have derivative absolute immunity. *See Spaulding v. Nielsen*, 599 F.2d 728 (5th Cir.1979) (probation officer immune from damages for alleged misconduct in investigation and preparation of pre-sentence report); *Burkes v. Callion*,

433 F.2d 318 (9th Cir.1970) (probation officer has derivative judicial immunity), *cert. denied*, 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971); *Blackwell*, 570 F.Supp. at 478–79 (immunity of probation officers); *Richardson v. Grundel*, 85 Ill.App.3d 46, 40 Ill.Dec. 569, 406 N.E.2d 575 (1980) (immunity of probation officer under Illinois law); *see also Scott v. Dixon*, 720 F.2d 1542 (11th Cir.1983) (immunity of court clerk), *cert. denied*, —— U.S. ——, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984); *Briscoe v. La-hue*, 663 F.2d 713, 722 (7th Cir.1981) (immunity of court reporter), *aff'd on other grounds*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Dieu v. Norton*, 411 F.2d 761 (7th Cir.1969) (immunity of court clerk and reporter).[11]

The fact that the functions performed by the plaintiff as a probation officer were inextricably tied to discretionary decisions that have consistently been considered judicial acts is the fundamental factor to consider in deciding whether the defendant was acting in a judicial capacity when he demoted and terminated the plaintiff. *See Lewis*, 555 F.Supp. 713; *Marafino*, 537 F.Supp. 206; *Pruitt*, 536 F.Supp. 764. We stress, however, that the nature of this relationship depends on the facts of each case. We cannot set forth a general rule, because the interaction between the judge and the members of his staff does not always appropriately implicate the decisions of the judge *qua* judge. *See Goodwin*, 729 F.2d at 548–49 (relationship between judge and hearing officer too distant to implicate substance of judge's decisions). Each court system differs in the manner in which it allocates responsibility to court personnel. However, because the employment relationship at issue here was dominated by acts that were unquestionably taken in the defendant's judicial capacity within the meaning of *Bradley, Stump,* and their progeny, the contested actions of the defendant in demoting and dismissing

---

11. This is not to suggest that a judge would be immune in every damage action brought by a former employee who enjoyed derivative immunity while working for the judge. However, it is unlikely that a judge would be immune in an action brought by an employee who did *not* have derivative immunity, because the lack of derivative immunity indicates that the employee was removed from the discretionary decision-making process.

the plaintiff would affect his ability to act in a principled and independent manner in his role as a judge if he could not undertake those actions without the protection of the defense. We conclude, therefore, that he is entitled to absolute immunity from civil damages in this case.

The evil to be avoided is the following: A judge loses confidence in his probation officer, but hesitates to fire him because of the threat of litigation. He then retains the officer, in which case the parties appearing before the court are the victims, because the quality of the judge's decision-making will decline. In this case, four of the five factors discussed in *Bradley* are directly implicated. First, the judge will not be able to act on his convictions in deciding cases, because he will not have the aid of a probation officer in whom he has trust and confidence. Second, he will be driven to wasteful self-protective devices. Third, alternative safeguards, such as impeachment, censure, equitable and declaratory relief, and market forces, reduce the need for a private damage action. Finally, the ease of alleging bad faith in the demotion and dismissal renders good-faith immunity virtually worthless. The judge may also be open to suits from litigants who discover that his professional relationship with his probation officer has declined, and he may thus expose himself to charges of impropriety and lose the respect necessary for the effective discharge of his responsibilities.

One could say a conscientious judge would act on his convictions and discharge the employee, but this is an argument against immunity in its entirety. The defense reflects a general recognition that, by his elevation to the bench, a judge cannot always rise above the frailties he shares with those individuals the propriety of whose conduct he is now called upon to judge. If similarly situated litigants were always similarly judged, perfect procedural justice would obtain. This, however, is not the world in which we find ourselves. Doctrines such as judicial immunity are needed to promote the effective administration of our legal system, and in attempting to fashion a system of "justice for all" we cannot guarantee justice for each. The meritorious claims of some who are adversely affected by improper judicial decisions are swept aside with the meritless ones. The tribute thereby exacted is a consequence of having human acts judged by human actors.

█ The defense, however, will not protect a judge from his intemperate acts in every instance. Only when his conduct occurs in a context in which even the properly motivated judge would be reluctant to act without protection from a civil-damage action and when that reluctance would undermine the integrity of the general process of judicial administration is immunity appropriate. This is such a case.

To summarize, we hold that the defendant's decisions to demote and dismiss the plaintiff were judicial acts performed within the scope of his authority. He is then, under the facts of this case, entitled to the defense of judicial immunity. We, of course, express no opinion on other decisions relating to Judge White's staff or even to probation officers in a different court system, because it must be determined in each case that the grant of immunity advances the policies behind it. We have, as we must, addressed only the facts of the case before us.

### III

For the reasons stated above, the judgment of the district court is AFFIRMED.

POSNER, Circuit Judge, dissenting.

Section 1 of the Civil Rights Act of 1871 (now 42 U.S.C. § 1983) creates a federal tort remedy against persons who violate federal rights under color of state law. The statute does not mention immunity or other defenses to liability, but this just shows (as is anyway obvious) that the statute was not intended to be a complete code of tort liability. Procedures, remedies, defenses have to be grafted on; whether one calls the process of completing the statute interpretation, or common law elaboration,

or policymaking (see *Smith v. Wade*, 461 U.S. 30, 93, 103 S.Ct. 1625, 1659, 75 L.Ed.2d 632 (1983) (O'Connor, J., dissenting)), the objective is the same—to integrate the statute into a system of liability and remedies in which due regard is paid to all relevant considerations, including the impact of liability on the performance of essential public functions.

Today my brethren hold that a state judge can never be made to pay damages for firing a probation officer in violation of the officer's constitutional rights; the judge's immunity is absolute. My brethren emphasize that a judge exposed to the threat of being sued for damages may hesitate to fire an incompetent probation officer, and that the public will suffer from his hesitation. Most members of a judge's staff serve for a short time (this is true of most law clerks), do not perform essential services, or lack discretionary authority. So in the generality of cases the harm to the public if a judge is inhibited by fear of being sued from firing an incompetent staff member is clearly not great enough to justify giving him absolute immunity from suit. But in the case of probation officers and other judicial or quasi-judicial employees who are selected by judges— such as (in the federal system) magistrates and bankruptcy judges—the harm to the public if a judge is led to retain an unqualified employee by fear of being sued could be very serious.

Forceful as this point is, it does not justify giving judges absolute immunity from liability for firing a probation officer in violation of the Constitution, even when the point is combined with another that my brethren but hint at. There are administrative and judicial remedies, particularly under Title VII of the Civil Rights Act of 1964, as amended in 1972 to cover public employers, see 42 U.S.C. §§ 2000e(a), (b), 2000e-2(a), for some forms of employment discrimination by such employers, so that granting a state judge absolute immunity for such discrimination would not leave his victims completely without remedy. The second point is incomplete; the probation officer would have no remedy if he were fired for an unconstitutional reason for which Title VII or other statutes provided no remedy against the employing agency. The deeper problem is that both points are applicable to a wide range of official conduct that has been held not to be protected by absolute immunity: a police chief's decision to fire a police lieutenant, for example.

Indeed the reasoning of the majority opinion extends to every consequential employment decision by every government official. The opinion cannot logically be confined to firing, although it carefully avoids any reference to failing or refusing to hire. Hiring an unqualified person because of fear that one might otherwise be sued for discrimination is no different from firing an unqualified person because of the same fear. It would be a curious notion that a judge must hire probation officers without regard to their race or sex but is free to fire them on the basis of their race or sex. The majority opinion cannot logically be confined to the hiring and firing of probation officers or other judicial or quasi-judicial personnel, either. Incompetent employees of other branches of government besides the judicial can do just as much harm to the public; and it does not follow that because a probation officer can be said to perform quasi-judicial acts, firing that officer is a judicial act, even if it is done by a judge. Finally, the emphasis that my brethren place on the confidential nature of the relationship between judge and probation officer would be relevant only if the judge were charged with having fired the probation officer on political grounds. See, e.g., *Soderbeck v. Burnett County*, 752 F.2d 285, 288 (7th Cir.1985). Even then it might very well not be determinative. See, e.g., *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (assistant public defender).

In a society that prides itself on subjecting even its highest officials to the restraints of law (see, e.g., *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)), a position historically novel and still far from universal, the grant of absolute immunity from civil liability—

immunity, that is to say, from such liability even for deliberate wrongdoing—must be confined to situations where such immunity is not merely convenient but essential. *Id.* at 507, 98 S.Ct. at 2911. And in deciding whether this demanding test has been met federal judges must be sensitive to the accusation of arbitrarily exempting themselves from liabilities which they have imposed in the name of the Constitution on other public officials, state and federal. The present case concerns state judges sued under section 1983 but its logic applies with equal force to federal judges sued directly under the Constitution. It thus engenders tension with *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The Supreme Court held in that case that a Congressman could be sued for damages directly under the Constitution for firing his deputy administrative assistant because she was a woman. Although the Court reserved certain immunity questions, it said that "if petitioner is able to prevail on the merits, she should be able to redress her injury in damages." *Id.* at 248, 99 S.Ct. at 2278. The same thing can be said about a probation officer fired by a judge. It is true that the District of Columbia Circuit held recently that the Constitution's "speech and debate clause" (Art. I, § 6) immunizes members of Congress from liability in damages for firing an employee whose "duties are an integral part of the legislative process." *Browning v. Clerk,* 789 F.2d 923, 928 (D.C.Cir.1986). But even if this holding is correct, it is correct in virtue of an explicit constitutional provision that has no counterpart so far as judges are concerned; and we are not authorized to repair the oversights of the Constitution's framers.

As my brethren recognize, the purpose of absolute immunity is not to make life easy for officials of any branch of government; it is not to foster judicial peace of mind. We must not allow our vocationally sharpened sensitivity to the difficulties of performing judicial duties in this contentious era to influence us to immunize ourselves and other judges from the legal hazards of public office. The only tenable rationale of absolute immunity is the need to protect officials from being seriously deflected from the effective performance of their duties. Absolute immunity is strong medicine, justified only when the danger of such deflection is very great. Analysis thus requires careful attention to the tradeoffs involved in a judgment to grant absolute immunity. A lawsuit imposes costs even on a prevailing defendant, who generally cannot recover his attorney's fees; in addition some defendants who ought to win their suits lose them simply because the judicial system like most other human institutions makes mistakes. So every individual has an incentive to avoid conduct that will get him sued; but the conduct he avoids may be conduct that promotes the welfare of society, and if so the incentive will have socially costly consequences. These costs have to be balanced against those of letting wrongdoers get off scot-free. Ordinarily the latter costs are thought greater but not when (1) the nature of the potential defendant's job is such that he can be expected to be sued constantly, (2) most such suits will be frivolous, (3) the defendant can reduce the probability of being sued by taking measures to avoid exposure to suit, (4) those measures are, however, socially costly because of the nature of the defendant's work, and (5) the victims of his wrongdoing have other remedies.

These conditions coalesce in the case of a judge sued for judicial rulings, or a prosecutor for decisions whether to prosecute, or a legislator for legislation—and judges, prosecutors, and legislators, and officials acting in these capacities though not called such (including ad hoc judges, such as jurors), are (apart from the President of the United States) the principal officials who enjoy absolute immunity from federal civil liability. See, e.g., *Cleavinger v. Saxner,* — U.S. —, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985); *Mitchell v. Forsyth,* — U.S. —, 105 S.Ct. 2806, 2812, 86 L.Ed.2d 411 (1985); *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 731–36, 100 S.Ct. 1967, 1974–77, 64 L.Ed.2d 641

(1980). Witnesses are absolutely immune for similar reasons. The absolute immunity of judges from civil liability for their rulings has been an established principle of Anglo-American jurisprudence for hundreds of years. See, e.g., *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347–54, 20 L.Ed. 646 (1872), and cases cited there; Note, *Pulliam v. Allen: Delineating the Immunity of Judges From Prospective Relief*, 34 Cath. U.L.Rev. 829, 838–43 (1985). It was held applicable to suits under section 1983 in *Pierson v. Ray*, 386 U.S. 547, 554–55, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). But there is nothing in this history to suggest that judicial immunity extends beyond judicial rulings.

The business of a judge is to rule against people. Every contested case has a loser, often a sore one. And the class of litigious people is of course overrepresented in litigation, meaning that the loser of a lawsuit is more likely (if permitted) to vent his anger by bringing another lawsuit than would be the average loser of a nonlegal contest. A judge of this court votes in more than 200 cases a year, and every (nondissenting) vote produces a loser. A significant fraction of the losers would sue the judges if they could do so (some sue us despite our absolute immunity). The vast majority of such suits would be frivolous, for they would be efforts to attack a final judgment collaterally by attacking the judge, a mode of collateral attack that would not be tolerated even if judges were not completely immune from being sued for damages for their judicial rulings. Nevertheless these suits would be costly in the aggregate and could lead to measures of avoidance of various sorts. Some people would decline to become judges, though well qualified. Others would pull their punches in cases where one of the litigants seemed particularly irate or contentious. Others would try to duck cases involving such litigants. For none of these techniques of avoidance would there be effective remedies. People who are scared of being sued cannot be forced to serve as judges. Nor will taxpayers raise judicial salaries high enough to compensate judges for running the grave litigation risks they would run in having to judge without immunity from liability for their rulings. And because judges exercise great discretion (despite the pious insistence that ours is a government of laws not men), judicial timidity is hard to prove and even harder to punish. Many judges, including all federal judges, are beyond the power of effective correction by the political branches of government and thus can pull their punches to their hearts' content. Finally, the victim of a wrongful judicial ruling ordinarily has a remedy by way of appeal to a higher court.

The case for granting judges absolute immunity for their judicial rulings is thus a powerful one, but one not easily transposed to judges' decisions on staffing their chambers. Consider the compact statement of the rationale for absolute judicial immunity in *Pierson v. Ray, supra*: "It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." 386 U.S. at 554, 87 S.Ct. at 1218. Notice how the entire discussion is geared to the judge's role in making judicial decisions. If there is a case for absolute immunity from civil liability for judges' employment decisions, it is a completely different case from the traditional one. The decision today breaks new ground; and novelty is not always a virtue in law.

Absolute immunity as traditionally conceived (I mean the judge-made doctrine, not the absolute immunity that federal legislators enjoy by virtue of the speech and debate clause in Article I) is limited to the situation where an official's position requires that he be constantly hurting members of the public—so that if he is not immune he will be a constant target of

litigation—and where in addition massive litigation or its threat is likely to distort his official behavior, to the serious detriment of the public. This describes the position of judges in rendering judicial decisions and of prosecutors in prosecuting. But no one thinks that a state or federal district attorney should be absolutely immune from liability for discriminating in the hiring or firing of assistant district attorneys; and why should there be a different rule for judges who discriminate in hiring or firing their subordinates? A district attorney may be responsible for initiating hundreds or even thousands of prosecutions in the course of a year, and every one would be a potential lawsuit against him if it were not for absolute immunity. Prosecutors enjoy a broad, essentially unreviewable discretion in deciding whom to prosecute, while judges enjoy a broad discretion, too—discretion to decide cases plausibly for either party. Many judges (all federal judges) are in addition protected from removal by the other branches of government. If either type of official is made timid by fear of being sued and his performance suffers as a result, the public will not be the wiser; even if it is, it may not be able to do anything to whip the official back into line. But a prosecutor or judge is no more likely to be sued for employment discrimination than any other employer, public or private. Cf. *Mitchell v. Forsyth, supra,* 105 S.Ct. at 2813. He does not face an avalanche of lawsuits if absolute immunity is denied; and his employment decisions are, if not fully subject to outside evaluations, less inscrutable than prosecutorial and adjudicative decisions, or at least no more inscrutable than the employment decisions of other officials.

It is true that so far as potential exposure to suit by members of the public is concerned, a policeman is in much the same position as a judge or prosecutor yet enjoys no absolute immunity from civil damage actions. There are reasons for the difference in treatment. One, which is merely realistic, is that a policeman rarely has sufficient assets to be worth suing (of course this is also true of many assistant

district attorneys), unless he is indemnified by his employer—in which event the suit is unlikely to have much impact on his performance of his duties. The threat of suit is less likely to affect the performance of his duties for another reason as well: he has less discretion than a judge or prosecutor. He is also more amenable to discipline and control by his superiors if he seems to be flagging. Finally, unless policemen can be sued for using excessive force or for false arrest, many victims of these excesses will be without any remedy. In contrast, judicial decisions are subject to appeal and prosecutorial decisions are subject to correction by grand juries, petit juries, trial judges, and appellate judges.

Granted, a public employee who has been fired may have alternative remedies to a suit for damages, a fact that might seem to make him more like the loser of a lawsuit than like the victim of police brutality. A probation officer fired on grounds of race or sex has no right of appeal but does have administrative and judicial remedies against the employing agency (i.e., the court rather than the judge). These remedies are limited, most importantly in allowing only equitable relief: the fired employee can get reinstatement with back pay but cannot get common law damages. But the loser of a lawsuit cannot get common law damages either; he can only get a reversal on appeal. In any event, the absolute immunity of judges cannot be made to depend on the accident that a legislature has created an alternative remedy, for it is not something that distinguishes a judge from any other public employer.

If I did not have absolute immunity for my judicial rulings I would be enveloped in a cloud of litigation that my estate would still be defending long after my death. But I have never thought I had absolute immunity for employment decisions, including decisions on bankruptcy judges in which I participate as a member of the Seventh Circuit's Judicial Council. Judges do not need such an immunity in order to perform their duties effectively. Without it there may be some diminution in our

effectiveness but not enough to justify absolute immunity if I am right that it can be granted consistently with our traditions only when the circumstances are compelling. Some evidence that we need not fear a flood of lawsuits if the district court's decision is affirmed is that this appears to be the first case in which a judge's absolute immunity from damage liability for employment discrimination has even been argued at the federal appellate level; it was not argued in *Goodwin v. Circuit Court of St. Louis County*, 729 F.2d 541, 545–46 (8th Cir.1984), where the Eighth Circuit recently upheld a damage judgment against a state judge for removing a hearing officer because of her sex. That case might have been decided differently if a litigant had sued the judge for having fired the hearing officer, for in relation to litigants the employment decisions of judges may be the sort of judicial act to which absolute immunity attaches; but in relation to the employee or job applicant, employment discrimination by a judge does not engage the policy behind the doctrine of absolute judicial immunity.

The failure to distinguish carefully among the different kinds of acts that judges perform is, indeed, the fatal weakness in the majority opinion. Carried to its logical extreme, the opinion would attach absolute immunity to any major decision made by a judge within the scope of his lawful powers. The proper question is whether the decision was made in the judge's judicial capacity. Judges have both judicial and executive functions. Hiring and firing subordinates are executive functions. The basic distinction is well established in the cases. See *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978); *Lopez v. Vanderwater*, 620 F.2d 1229, 1233–35 (7th Cir.1980); *Harris v. Deveaux*, 780 F.2d 911, 914–16 (11th Cir.1986); *Dykes v. Hosemann*, 776 F.2d 942, 945 (11th Cir.1985) (en banc) (per curiam); *Holloway v. Walker*, 765 F.2d 517, 522–25 (5th Cir.1985); *Richardson v. Koshiba*, 693 F.2d 911, 913–15 (9th Cir. 1982); Note, *What Constitutes a Judicial Act for Purposes of Judicial Immunity?*, 53 Fordham L.Rev. 1503 (1985). As the Ninth Circuit said in *Gregory v. Thompson*, 500 F.2d 59, 65 (9th Cir.1974), where the defendant, a judge, had forcibly expelled the plaintiff from the judge's courtroom, "Judge Thompson's choice to perform an act similar to that normally performed by a sheriff or bailiff should not result in his receiving absolute immunity for this act simply because he was a judge at the time." See also *Ammons v. Baldwin*, 705 F.2d 1445, 1448 (5th Cir.1983). Or as we said in both *Lowe v. Letsinger*, 772 F.2d 308, 311–12 (7th Cir.1985), and *Glick v. Gutbrod*, 782 F.2d 754, 756 (7th Cir.1986) (per curiam), "The doctrine [of absolute immunity] applies to damage claims, ... but not to ministerial or administrative acts."

I realize that the line between the judicial and the administrative is not hard and fast; the rulings that a judge makes in the course of "administering" a school system or prison system under a consent decree are entitled to absolute immunity. *Holloway v. Walker, supra*, 765 F.2d at 525. I recognize the hint—no more—in *Richardson v. Koshiba, supra*, 693 F.2d at 914 n. 10, that the classification of the act is determined by the office of the actor rather than the nature of the act. I realize that the cases I have cited are not factually similar to the present one—except for one, but as it is a decision of the Supreme Court, though an old one, we should pay particular attention to it. In *Ex Parte Virginia*, 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1880), a county judge was indicted for racial discrimination in selecting jurors to serve in the county's courts. To the judge's argument that he was immune from such a prosecution the Court answered in words applicable to the present case, "Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge.... That the jurors are

selected for a court makes no difference. So are courtcriers, tipstaves, sheriffs, etc.," *id.* at 348—and probation officers. This was said in the context of a criminal prosecution but it would be surprising if a suit for civil damages brought by the prospective jurors whom the judge had discriminated against would have been deemed barred by the doctrine of absolute immunity.

My brethren would give judges more protection than other officials not because of the acts that they do which are distinctively judicial (for I contend that firing a subordinate, even a judicial subordinate, is not a distinctively judicial act) but just because they are judges. The same racial or sexual or age discrimination in firing a probation officer is to be immunized from civil liability if the person doing the firing is a judge, and is not to be immunized if the person is another probation officer, or some other executive officer, or a judicial administrator, or in short anyone who does not himself perform—though of course not in the act of hiring or firing—a judicial function.

So I think my brethren are wrong to grant Judge White absolute immunity, and I would reverse the judgment of the district court. But I also think that the protection against suit that the majority opinion creates is illusory. The majority is so intent on writing a narrow opinion that it leaves the scope of its new doctrine of absolute immunity entirely uncertain. Can it really be that the doctrine is to be limited to the firing of probation officers in Illinois juvenile courts? The logic of the opinion cuts a much broader swath, but judges cannot be (perhaps should not be) forced to apply principles in their full logical reach. The majority calls for "a critical evaluation of the concerns underlying the defense" of absolute immunity in each case; it declines to express any "opinion on other decisions relating to Judge White's staff or even to probation officers in a different court system, because it must be determined in each case that the grant of immunity advances the policies behind it." It is right for judges to be cautious when they set sail on uncharted seas, but in the field of immuni-

ties this may be a reason for not leaving port in the first place. The absolute immunity for a judge's legal rulings is about as definite a rule as we have in our legal system, and the absolute immunity that the court creates today is about as indefinite, which robs the principle of its value to the judges and to the public. Absolute immunity provides real security only if the scope of the immunity is well defined. Under the court's approach the process of definition will be protracted and may never yield a clear rule on which employees or job applicants may sue which judges and which may not, and for what. We shall still have to buy liability insurance.